James D. TRENTON

v.

INFINITY BROADCASTING
CORP., et al.

No. CV 94–0601–WDK.

United States District Court,
C.D. California.

Sept. 6, 1994.

Attorneys for plaintiffs none present.

Attorneys for defendants none present.

KELLER, District Judge.

PROCEEDINGS:

Before the Court are plaintiff's Motion to Remand pursuant to 28 U.S.C. § 1447 and defendants' Motion to Dismiss pursuant to Fed.R.Civ.P. 12(b)(6).[1] In the underlying

---

1. In an apparent oversight, this Court issued an Order to Show Cause ("OSC") regarding why this action should not be remanded to state court after plaintiff had filed his motion. The parties' responses to the OSC have accordingly been tak-

matter, originally filed in state court, plaintiff pleads 20 causes of action, including the Sixth Cause of Action for copyright infringement under state law.[2]

Defendants subsequently removed to federal court, and shortly thereafter filed their Motion to Dismiss. Plaintiff then moved this Court to remand this action to state court, and also requested sanctions for attorneys' fees totalling $9,585 stemming from defendants' removal of the case.

Plaintiff's allegations can be summarized as follows: (1) he conceived and remains the owner of the program format for the Loveline radio program ("Loveline"), and that (2) by broadcasting the program without him, defendants have (a) misappropriated, infringed and converted plaintiff's concept and (b) breached implied and express oral promises made to him. He seeks a total $22,175,000 in damages. Defendants respond that: (1) plaintiff's purported property interest in the radio program format is prohibited by Section 102(b) of the federal Copyright Act, and (2) Section 301(a) of the Act preempts all of plaintiff's causes of action in that they are predicated upon a non-existent copyright interest in Loveline.

## I. BACKGROUND FACTS

### a) The Parties

Plaintiff James Trenton is a radio announcer/talk show host. He is under contract to defendant Infinity Broadcasting of Los Angeles, Inc. ("Infinity L.A."), owner and operator of defendant radio station KROQ, 106.7 FM, in Burbank, California ("KROQ"). Plaintiff has been suspended indefinitely from broadcasting by his employer since August, 1993. Although suspended, he remains under con-

tract until November, 1994, and continues to draw his regular salary. He has been associated with the station since 1981.

Defendant Infinity Broadcasting Corporation ("Infinity") is the parent corporation of Infinity, L.A. Infinity purchased the station in June, 1986, from Ken Roberts. Defendant Mel Karazin ("Karazin") is President and Chief Executive Officer of Infinity. Defendants Kevin Weatherley ("Weatherley") and Trip Reeb ("Reeb") are employed by Infinity L.A. as, respectively, program director and general manager of KROQ.

### b) Plaintiff's Tenure at KROQ

Plaintiff first broadcast on KROQ in May, 1981. Initially, he worked without pay in order to gain experience in the radio business, airing reviews of inexpensive restaurants under the name "Poorman."[3] In September 1982, plaintiff began receiving pay for his on-air segments, which by that time involved various features and promotions. Plaintiff worked without a written employment contract until 1988.

In early 1983, plaintiff allegedly conceived a radio program format consisting of novel "program techniques" and "methods of presentation" for a new radio program he called Loveline. Plaintiff claims that in devising Loveline, he sought to create a program in which "listeners would be interesting (sic) in sharing their ideas on [social relations, dating and sexuality] live on the radio with each other and celebrity guests in a format that both emulated and mirrored real life discussion with friends." Plaintiff's Complaint ("Complaint"), ¶¶ 21, 23. Thus, Loveline would be dedicated to "informal discussion among the program hosts, listeners and

---

en under consideration in assessing the merits of plaintiff's motion.

**2.** Plaintiff's 20 causes of action are pled as follows: (1) Breach of Express Contract; (2) Breach of Implied Contract; (3) Quantum Meruit; (4) Quantum Valebant; (5) Unfair Competition; (6) Copyright Infringement (State Law); (7) Breach of Employment Contract; (8) Wrongful Constructive Termination; (9) Failure to Pay Wages; (10) Fraud; (11) Conspiracy to Commit Fraud; (12) Conversion; (13) Conspiracy to Commit Conversion; (14) Slander of Title I—Property; (15) Slander of Title II—Services; (16) Interference with Prospective Economic Advan-

tage; (17) Breach of Fiduciary Duty; (18) Rescission or Reformation; (19) Declaratory Relief re (A) Infinity's Standard Employment Contract and (B) Ownership of Trade Names and Format; and (20) Injunctive Relief re (A) Infinity's Standard Employment Contract and (B) Ownership of Trade Names and Format.

**3.** Plaintiff had earlier written a book entitled "The Poorman's Guide to Gourmet Dining in Pasadena for Under $6.00." He subsequently wrote "The Poorman's Guide to Gourmet Dining on the West Side of Town for Under $6.00."

guest celebrities about interpersonal relationships, dating, sexuality, drugs and drug-related problems ... present[ing] a forum for open discussion that listeners would intuitively perceive to be natural and relaxed rather than choreographed and commercially coerced." Complaint, ¶ 22.

At the commencement of every segment, the hosts and guests were to sing a "mock chorus" in order to "foster a receptive mood in the listening audience and to project the program's attitude of compassion and accessibility." Complaint, ¶ 27. This "chorus" would be comprised of the program name " 'Loveline,' sung with exaggerated emphasis on the syllable 'love' with the pitch beginning high on the syllable 'love' and ending low on the syllable 'line.' " Complaint, ¶ 27.

In January, 1983, plaintiff began broadcasting Loveline on KROQ under the name "Poorman." It initially aired once per week, from 12:00 a.m. to 2:00 a.m. on "Sunday nights." [4] Plaintiff asserts that "[l]isteners received the program enthusiastically, and its popularity grew." [5] Complaint, ¶ 30. Approximately one year later, plaintiff introduced a medical expert co-host, Drew Pinsky, onto the program for the purposes of (1) lending credibility to any medical advice given on the air and (2) enhancing the program's on-air chemistry. Complaint, ¶ 32.

In addition to Loveline, plaintiff broadcast several different programs at varying time slots over the next few years, all under the name "Poorman." In approximately late 1985, in response to its increasing popularity, Loveline was placed in an earlier time slot, Sunday nights from 11:00 p.m. to 1:00 a.m.[6] From mid–1986 until February, 1992, the program was broadcast late Sunday nights or early Monday morning., either at that time

or in the 10:00 p.m. to midnight or 11:00 p.m. to 2:00 a.m. time slot.

On November 1, 1988, several months after Infinity purchased KROQ, plaintiff signed a three-year employment contract. Plaintiff claims that, at the time of the signing, he (1) believed he was required to sign the contract if he wanted to continue working at the station, (2) did not understand the contract, and (3) did not want to sign the contract. In November 1991, when this contract expired, plaintiff signed another three-year contract.[7]

Meanwhile, Loveline's popularity grew dramatically. By late 1991, it was by far the highest rated program in its time slot, and its audience share, plaintiff claims, was the highest any program had achieved in the Los Angeles market in decades. Complaint, ¶ 51.

In February 1992, station management informed plaintiff that, because of the show's strong performance, Infinity wanted to broadcast Loveline five nights a week during the 10:00 p.m. to midnight time slot. Plaintiff claims he initially hesitated to undertake the new schedule due to concerns about losing the substantial income he had been earning from late evening personal appearances. However, he ultimately agreed to the arrangement after Reeb allegedly told plaintiff that Infinity would: (1) pay off a $25,000 loan plaintiff had taken to start a clothing business; (2) increase his regular compensation to make up for the lost personal appearances; (3) further increase his regular compensation to appropriately reflect any success the program achieved airing five nights per week; (4) give him complete discretion in the number and nature of celebrity guests that would appear on the show; (5) arrange to syndicate Loveline "on plaintiff's behalf" if the show became successful airing five days per week; (6) continue to contract with Pinsky for his

---

**4.** It is unclear from plaintiff's complaint if the program was in fact broadcast early Sunday morning or early Monday morning.

**5.** As an example of the program's "novel new format, program techniques and methods of radio presentation" being successful, plaintiff contends that in 1984 Loveline was the first radio or television program to address the then-nascent issue of Acquired Immune Deficiency Syndrome (A.I.D.S.). Complaint, ¶ 31.

**6.** Plaintiff's complaint states that the program was broadcast from "11:00 p.m. to 1:00 p.m. (sic)" Complaint, ¶¶ 40, 42. The Court assumes plaintiff intended to state "1:00 a.m."

**7.** Plaintiff claims that, in signing both contracts, he "did not intend to convey his rights in the format of Loveline, the names 'Poorman' and 'Loveline,' or the 'Loveline Jingle' ....," and that he would not have signed the contract "if he had thought by doing so those rights would be affected." Complaint, ¶¶ 48, 55.

services as co-host; and (7) "continue to give plaintiff exclusive recognition for the creation of his 'Loveline Property,' [and] ... continue to acknowledge and honor plaintiff's exclusive right to perform Loveline as the lead host." [8] Complaint, ¶ 63.

Loveline debuted as a Monday–Friday offering on February 9, 1992. The program's success in its new incarnation was swift and resounding, as within one year it had become the number one show in its time slot by a wide margin. By the spring of 1993, Loveline had become the fourth most listened to program in Los Angeles, behind only the three most popular morning programs.

However, Loveline's success did little to improve the increasingly strained relationship between plaintiff and station management. In July, 1989, over two years before Loveline became a Monday–Friday program, KROQ had suspended plaintiff for three days after he invited his listeners to telephone his program and discuss an issue station management allegedly had not wanted discussed on the air. [9] In December, 1992, plaintiff was again suspended, this time for five days, after he mentioned the name "Howard Stern" on the air after being told by station management not to use KROQ's morning competition's name in his program. [10]

Plaintiff was suspended indefinitely following a third incident in February, 1993. During a Loveline broadcast, plaintiff and Pinsky allegedly "choreographed" a dispute, and plaintiff walked off the show "as an artistic and creative decision." Pinsky continued the broadcast, which allegedly generated "intense listener interest" in following segments. Complaint, ¶¶ 70, 71. Following month-long negotiations between plaintiff, plaintiff's agent and station management regarding the terms of plaintiff's return to the air, plaintiff returned to the airwaves on March 21, 1993. [11]

Plaintiff was suspended, again indefinitely, on August 23, 1993. [12] Plaintiff contends that the suspension was in fact retaliation for the parties' disagreement over the ultimate ownership of the "Loveline Property." [13] Com-

---

**8.** This last representation, allegedly made to plaintiff by station management, captures a key aspect of plaintiff's theory of the case. As such, whether this contention states a claim upon which relief may be granted pursuant to Fed. R.Civ.P. 12(b)(6) will be considered in detail below.

**9.** The incident involved a disturbance at a West Hollywood record store during a promotion sponsored by KROQ. Approximately 18,000 people attended the event, and there were allegedly numerous injuries. Plaintiff claims he had not been informed of Infinity's desire to "ignore" the incident. Complaint, ¶ 50.

**10.** Howard Stern is a radio announcer also employed by Infinity, but appearing on other Infinity-owned radio stations. Plaintiff stresses that Infinity failed to suspend Stern when he discussed "Loveline" on his program. Complaint, ¶ 69. Plaintiff also contends that the suspension occurred, not coincidentally, immediately after negotiations between himself and Infinity had broken down over who owned any potential syndication rights in Loveline. Complaint ¶ 68.

**11.** After plaintiff was suspended, his attorney sent a letter to Infinity "asserting plaintiff's right of ownership and performance of Loveline, demanding immediate cessation of Infinity's use of plaintiff's format and trade name of 'Loveline' and demanding plaintiff's immediate reinstatement." The subsequent negotiations allegedly focused on the repayment of plaintiff's business loan, his compensation, and ownership of Loveline syndication rights. Complaint, ¶ 72.

**12.** Infinity acted after plaintiff allegedly invited listeners of Loveline to meet at the radio station and proceed to the home of KROQ's morning announcer to "celebrate" plaintiff's birthday. Approximately 250 listeners responded to the invitation, which was allegedly in retaliation for the KROQ morning announcers' orchestration of a stunt earlier that day in which several KROQ employees entered plaintiff's home while he slept at 6:55 a.m. to "celebrate" plaintiff's birthday live on the morning program. Complaint, ¶ 83.

**13.** Plaintiff argues that neither the morning announcers involved in the birthday prank nor other station employees involved in the subsequent "retaliation" were disciplined. He also points out that Infinity has not suspended another employee, Howard Stern, for improper conduct resulting in fines against Infinity by the Federal Communications Commission of over $1,000,-000. Moreover, plaintiff contends that Infinity failed to act when the two morning announcers involved in the birthday prank and another individual later hired by Infinity staged a phone-in murder "confession" on the KROQ morning program. The hoax, which received widespread publicity at the time, was later exposed by Burbank police. Complaint, ¶¶ 83, 84.

plaint, ¶ 85. On November 1, 1993, KROQ announced a new permanent lead host for Loveline, and since the latest suspension has refused to allow plaintiff to broadcast. Plaintiff remains under contract with Infinity until November 12, 1994, and apparently continues to draw his salary.

### c) Plaintiff's Claim

Plaintiff's suit stems from Infinity's (1) suspension of plaintiff from broadcasting and (2) assertion of ownership rights in Loveline. He claims that when he "offered" his program idea to KROQ, he made the offer contingent upon the station's agreeing to give him exclusive recognition as creator and acknowledge and honor his exclusive right to act as lead host. Complaint, ¶ 28. KROQ allegedly accepted plaintiff's offer unconditionally. Complaint, ¶ 29. Plaintiff further avers that when he signed his three-year contracts with Infinity L.A. in 1988 and 1991, he did not intend to convey his rights in the "Loveline Property" and would not have signed the contract if he had thought that by doing so those rights would be affected. Complaint, ¶¶ 48, 55.

From this set of pled facts, plaintiff brings 20 state law causes of action. Notably, plaintiff's Sixth Cause of Action for copyright infringement is brought as a state law cause of action, and not under federal copyright law. The remaining 19 causes of action may be classified as either (1) claims stemming from defendants' alleged misuse of plaintiff's "property," or (2) breach of contract claims stemming from defendants' suspension of plaintiff and alleged failure to comply with their agreements.[14]

Plaintiff seeks damages totalling $22,175,-000, as well as declaratory and injunctive relief regarding (a) his interest in Loveline and (b) his contractual agreements with Infinity. The damages alleged include losses of: (1) $9,000,000 in radio licensing and syndication fees; (2) $4,000,000 in television licensing and syndication fees; (3) $2,000,000 in loss of publicity and advertising; (4) $3,000,000 in damage to plaintiff's reputation; (5) $2,000,000 in performance contracts with television and radio stations; (6) $2,150,000 in wages; and (7) $25,000 in promised funds to pay off plaintiff's business loan.

## II. LEGAL STANDARDS

### a) Removal and Remand

■ Removal is proper when a state court action could have originally been filed in federal court. 28 U.S.C. § 1441. However, a plaintiff is the master of his complaint, and may preclude removal by relying exclusively on state law. *Caterpillar Inc. v. Williams*, 482 U.S. 386, 392, 107 S.Ct. 2425, 2429–30, 96 L.Ed.2d 318 (1987). But a plaintiff may not avoid removal by neglecting to plead a necessary federal question in the complaint. 14A Wright, Miller & Cooper, *Federal Practice and Procedure:* Jurisdiction 2d § 3722 (1985 & Supp.1993).

■ A district court may remand a case to state court at any time prior to final judgment if it appears that the district court lacks subject matter jurisdiction. 28 U.S.C. § 1447(c). The district court may require payment of just costs and any actual expenses, including attorneys' fees, incurred as a result of the removal. *Id.* The burden of proof is on the defendant, the party invoking the federal court's removal jurisdiction, to prove whatever is necessary to support removal. *Gaus v. Miles, Inc.*, 980 F.2d 564 (9th Cir.1992). An attorney is subject to sanctions for removing an action to federal court without an objectively reasonable basis for doing so. *Rockwell International Credit Corp. v. U.S. Aircraft Insurance Group*, 823 F.2d 302 (9th Cir.1987).

### b) Fed.R.Civ.P. 12(b)(6) vs. Fed.R.Civ.P. 56

■ Fed.R.Civ.P. 12(b)(6) provides that a claim may be dismissed for failure to state a claim upon which relief can be granted. In considering such a motion, a court shall take all the allegations in the complaint as true and read them in the light most favorable to the nonmovant. *Boone v. Redevelopment Agency of San Jose*, 841 F.2d 886, 889 (9th Cir.1988), *cert. denied*, 488 U.S. 965, 109 S.Ct. 489, 102 L.Ed.2d 526 (1988). "[A] complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in

---

**14.** These two categories of claims are discussed in detail below.

support of his claim which would entitle him to relief." *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 102, 2 L.Ed.2d 80 (1957). Thus, a Rule 12(b)(6) dismissal is proper only in "extraordinary" cases. *U.S. v. Redwood City,* 640 F.2d 963, 966 (9th Cir.1981).

Summary judgment under Fed.R.Civ.P. 56 is appropriate only where there is "no genuine issue as to any material fact and ... the moving party is entitled to judgment as a matter of law." All inferences are granted in favor of the non-moving party; however, the non-moving party must provide specific evidence showing that there are facts creating genuine issues for trial. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323–25, 106 S.Ct. 2548, 2552–54, 91 L.Ed.2d 265 (1986).

■ The biggest difference between a Rule 12(b)(6) motion and a Rule 56 motion for summary judgment is that, with limited exception, the court cannot consider matters outside the pleadings in ruling on a Rule 12(b)(6) motion. If matters outside the pleadings are presented and not excluded by the court, the motion is converted into a motion for summary judgment as provided in Rule 56. *Mack v. South Bay Beer Distributors, Inc.,* 798 F.2d 1279, 1282 (9th Cir.1986).

Here, defendants move, pursuant to Rule 12(b)(6), to dismiss plaintiff's Complaint. However, this Court has found it necessary to consider a matter extrinsic to the pleadings, namely whether KROQ simultaneously recorded the Loveline broadcasts. This inquiry has been necessary to assess whether there is federal jurisdiction in this matter and, if so, whether plaintiff's Complaint states a claim upon which relief can be granted. Accordingly, defendants' Motion as regards plaintiff's copyright infringement cause of action will be assessed pursuant to Rule 56. The remainder of plaintiff's causes of action will be assessed under Rule 12(b)(6).

### III. PLAINTIFF'S COPYRIGHT INFRINGEMENT CAUSE OF ACTION

First, this Court must assess whether plaintiff's Sixth Cause of Action for copyright infringement arises under federal or state law. If it is found to arise under state law, plaintiff's Motion to Remand must be granted, as there will be no basis for federal jurisdiction under 28 U.S.C. § 1331.

However, if plaintiff's copyright infringement cause of action arises under federal law, under 28 U.S.C. § 1338(a), this Court has exclusive jurisdiction over it, and plaintiff's motion must be denied. If the motion is denied, the Court must then assess the merits of defendants' Motion to Dismiss.[15]

Lastly, the Court must address plaintiff's argument that the federal copyright statute is unconstitutional.

*a) Federal vs. California Copyright Protection*

*1. Relevant Statutes*

Section 102 of the federal Copyright Act defines the subject matter of federal copyright law as follows:

> (a) Copyright protection subsists ... in original works of authorship *fixed in any tangible medium of expression* ... from which they can be perceived, reproduced or otherwise communicated, either directly or with the aid of a machine or device.... Works of authorship include ... (7) sound recordings....
>
> (b) In no case does copyright protection for an original work of authorship extend to any idea, procedure, process, system, method of operation, concept, principle, or discovery, regardless of the form in which it is described, explained, illustrated, or embodied in such work.

17 U.S.C. § 102 (emphasis added). Thus, copyright protection is denied to "[i]deas, plans, methods, systems, or devices, as distinguished from the particular manner in which they are expressed or described in an writing. 37 C.F.R. § 202.1(b).

■ The Supreme Court has held that the states retain concurrent power under the

---

**15.** As discussed above, because this Court has looked outside the pleadings to assess whether the Loveline program was "fixed in a tangible form," defendant's Motion as regards plaintiff's copyright infringement cause of action will be treated as one for summary judgment and assessed under Rule 56.

Copyright Clause of the Constitution [16] to afford copyright protection to the works of authors as long as such protection does not conflict with federal law. *Goldstein v. California,* 412 U.S. 546, 93 S.Ct. 2303, 37 L.Ed.2d 163 (1973). Thus, state laws are subject to federal preemption only if they create "legal or equitable rights that are equivalent to any of the exclusive rights" within the general scope of federal copyright law. 17 U.S.C. § 301(a).

Accordingly, Section 980(a)(1) of the California Civil Code provides copyright protection outside the scope of that found in the federal statute. The state statute provides that:

> The author of any original work of authorship *that is not fixed in any tangible medium of expression* has an exclusive ownership in the representation or expression thereof as against all persons.... A work shall be considered not fixed when it is not embodied in a tangible medium of expression or when its embodiment in an tangible medium of expression is *not sufficiently permanent or stable to permit it to be perceived, reproduced, or otherwise communicated for a period of more than transitory duration,* either directly or with the aid of a machine or device.

(Emphasis added). That Section 980(a)(1) speaks of "ownership in the representation or expression" of works reflects the California legislature's intention to deny copyright protection to ideas, as opposed to the manner in which they are expressed or represented. *Weitzenkorn v. Lesser,* 40 Cal.2d 778, 788–89, 256 P.2d 947 (1953).

### 2. Discussion

■ Here, plaintiff contends that California law, not federal law, affords copyright protection to his alleged interest in Loveline. Plaintiff claims that his creations are mere ideas, and as such do not fall within the scope of federal copyright protection. Plaintiff then points to California case law recognizing "literary property in a particular combination of ideas (which presupposes the expression thereof), or in the form in which the ideas are embodied," and argues that a protectable copyright could exist under state law in a radio program format and name. *Colvig v. KSFO,* 224 Cal.App.2d 357, 366–7, 36 Cal. Rptr. 701 (1964), *citing Desny v. Wilder,* 46 Cal.2d 715, 732–33, 299 P.2d 257 (1956).[17]

However, as discussed above, Section 102 of the federal copyright code sets forth three conditions for copyrightability which, if met, bring a copyright action under federal law: (1) a work must be fixed in a tangible form; (2) the work must be an original work of authorship; and (3) the work must come within the subject matter of copyright. 17 U.S.C. § 102.

#### A) "Fixed in a Tangible Form"

The legislative history of Section 102 directly addresses whether a radio program format is "fixed in a tangible form." The House of Representatives Judiciary Committee commented that "the content of a live transmission should be regarded as fixed and should be accorded statutory protection if it is being recorded simultaneously with its transmission." Notes of Committee on the Judiciary, H.R. Report No. 94–1476, *reprinted in* 17 U.S.C.A. § 102, historical note, at 14–15 (West 1977 & Supp.1994). Because

---

**16.** "The Congress shall have power to promote the progress of science and useful arts, by securing for limited times to authors and inventors the exclusive right to their respective writings and discoveries ..." U.S. Const., Art. I., Sec. 8, Cl. 8.

**17.** In *Colvig,* a disc jockey for a San Francisco radio station alleged he had developed an original format for a disc jockey radio program by encouraging listeners to report traffic problems to the station by distributing membership cards in the "Commute Club." The *Colvig* court held that defendants had not proffered sufficient evidence to prevail at the summary judgment stage, but recognized that California law no longer recognized ideas themselves as protected. *Id.* 224 Cal.App.2d at 367, 36 Cal.Rptr. 701.

Plaintiff also cites *Kurlan v. Columbia Broadcasting System, Inc.,* 40 Cal.2d 799, 256 P.2d 962 (1953), for its holding that "a new radio production format" consisting of "new program techniques and methods of radio presentation" is entitled to intellectual property protection. *Id.* at 808–809, 256 P.2d 962. However, this case was decided under the pre–1947 version of Civil Code § 980(a)(1), which afforded copyright protection to the "product of the mind" as well as the "representation or expression thereof."

the statute requires only that the recording be made simultaneously, the party making the recording need not retain it for any particular length of time. *See Cable News Network v. Video Monitoring Services*, 940 F.2d 1471, 1484 (11th Cir.1991) ("conceivably, the broadcaster could erase the tape on which a transmission program was recorded within a matter of minutes, hours or days . . .").

Here, defendants claim that Loveline has been simultaneously recorded, and offer to produce 198 tapes[18] currently in their possession for this Court's inspection. They further submit a declaration from defendant Reeb asserting that (1) simultaneous recordings of the program were frequently made by KROQ since the program's inception, (2) since late 1992 KROQ has simultaneously taped every Loveline broadcast, and (3) on at least two occasions KROQ has broadcast "Best of Loveline" shows compiled from the simultaneous tape recordings. Reeb Declaration, ¶ 2. Additionally, in response to this Court's order of May 31, 1994, requesting additional proof supporting the assertion that Loveline was being simultaneously recorded, defendants submit a declaration from Loveline's producer, Ann Cherie Wilkins, stating that she has been personally responsible for taping the show since 1990, has witnessed the tape recordings being made since joining KROQ since 1987, and, upon joining the station, saw tapes of earlier broadcasts.[19] Wilkins Decl., ¶ 3. Moreover, defendants have also submitted a declaration from Infinity L.A. employee Scott Howard Hutcheson stating that on at least two occasions he used existing tape recordings of Loveline programs to create "Best of Loveline" shows that were broadcast over KROQ. Hutcheson Decl., ¶ 5. Hutcheson also declares that, due to the cost and difficulty of storing the volume of audio tapes necessary to record a daily radio program, KROQ recycles tapes of Loveline broadcasts that are more than a couple years old. Hutcheson Decl., ¶ 4.

In response to this Court's Order of June 16, 1994, requesting any evidence plaintiff possessed on the issue of simultaneous Loveline recordings, plaintiff contends that neither Infinity nor KROQ had a policy of making simultaneous recordings of Loveline from January 1983 until August 1993, and that a library of such tapes was never kept.[20] Plaintiff further contends that, beginning in 1992, the station would tape programs solely for the purpose of giving the tapes to guests who appeared on the program or, if he requested, for the review of defendant Weatherley. Thus, plaintiff argues, KROQ had only a "limited number of motley, used tapes and occasionally a new tape, which was then reused. . . . They were kept in any [sic] particular order . . . and were recorded over at random." Supplemental Trenton Decl., ¶¶ 8–10.[21]

Dispositive here is whether and how often the radio program was being simultaneously recorded. "Once a performance is reduced to tangible form, there is no distinction between the performance and the recording of the performance for the purpose of preemption under § 301(a)." *Baltimore Orioles v. Major League Baseball Players*, 805 F.2d 663, 675 (7th Cir.1986), *cert. denied*, 480 U.S. 941, 107 S.Ct. 1593, 94 L.Ed.2d 782 (1987) (holding that once baseball players' performances are videotaped, the performances are fixed in a tangible form, and any rights of publicity in their performances that are equivalent to the rights contained in the copyright of the telecast are preempted).

---

**18.** KROQ claims to have in its possession 93 tapes of Loveline broadcasts from 1992 and 105 tapes from 1993 in which plaintiff appeared.

**19.** Wilkins also asserts that the previous Loveline producer told her the show had always been recorded. Wilkins Decl., ¶ 3. This statement is clearly inadmissible as hearsay.

**20.** Plaintiff further submits a declaration from Lee Albert, co-host of Loveline from 1985 through 1990, in which he declares that during that time KROQ did not have a policy to regularly record the "Loveline" show, but that "some of the shows were taped on a hit and miss basis." Albert also contends that station management ignored his suggestion to regularly tape the programs. Albert Decl., ¶¶ 5–8.

**21.** Plaintiff further alleges that defendant Reeb "explicitly instructed everyone not to keep any recordings of 'Loveline' made because of potential legal difficulties relating to the content of the programs." Supplemental Trenton Decl., ¶ 12.

Thus, if the Loveline program was simultaneously recorded, it was fixed in a tangible form and, other conditions being met, subject to the federal Copyright Act. Here, it is undisputed that the Loveline programs contained on the 198 tapes defendants offer to submit to this Court have been simultaneously recorded. Whether or not there was an official station policy to tape the shows is irrelevant, as is whether the station retained, recycled, gave away as gifts or discarded the tapes. *Cable News Network, supra.*

However, were certain programs not simultaneously recorded, and defendants have notably not claimed that every program was, those broadcasts would not be fixed in a tangible form and would therefore not fall under the federal statute. *See Baltimore Orioles, supra* ("if a baseball game were not broadcast or were telecast without being recorded, the players' performances similarly would not be fixed in tangible form and their rights of publicity would not be subject to preemption"). Accordingly, only those programs incontrovertibly simultaneously recorded may, at this stage, be deemed fixed in a tangible form.

### B) "Original Work of Authorship"

To constitute an "original work," a work must possess "an independent origin and a minimal amount of creativity." *Id.* Neither party disputes the program's originality and minimal creativity. It is an "original work of authorship."

### C) Copyright Subject Matter

As discussed above, Section 102(a) of the Copyright Act defines the subject matter of federal copyright law. Here, the radio program broadcasts constitute "sound recordings," which, under § 102(a)(7), come within the subject matter of federal copyright law.[22]

### 3. Conclusion

Plaintiff's Sixth Cause of Action alleging copyright infringement arises, at least in part, under the federal copyright statute, 17 U.S.C. § 101 *et seq.* This action thus presents a federal question, and was therefore

appropriately removed to this Court pursuant to 28 U.S.C. § 1446(b). Accordingly, plaintiff's Motion to Remand and accompanying request for sanctions are DENIED.

### b) Adequacy of Plaintiff's Copyright Infringement Claim

Federal copyright law affords no protection to ideas or principles alone. 17 U.S.C. § 102(b). Rather, only the particular manner in which they are expressed or described receives copyright protection. 37 C.F.R. § 202.1(b). Given that this Court's finding that plaintiff's copyright infringement cause of action presents a federal question relied in part on matters extrinsic to plaintiff's pleading, this Court must now assess whether the copyright cause of action survives defendant's Motion under the framework of a Rule 56 analysis.

### 1. Plaintiff's Claim

Here, plaintiff asserts a copyright interest in what he terms the "Loveline Property." He claims that he "conceived, originated, crafted and developed an original and novel format for a new radio program using new program techniques and methods of radio presentation ..., [and] created the names 'Poorman' and 'Loveline,' and the 'Loveline Jingle' to be used in connection with the new program." Complaint, ¶ 185. Plaintiff further alleges that he "licensed KROQ to use his 'Loveline Property,' but ... retained exclusive ownership and performance rights in it." Complaint, ¶ 186.

### 2. Discussion

#### A) Loveline Broadcasts

As discussed above, to the extent they were simultaneously recorded, the Loveline broadcasts qualify as fixed in a tangible form, constitute original works of authorship and, as sound recordings, come within the subject matter of the Copyright Act. Hence, the ideas which went into the making of Loveline are not protectable, and only the representation or expression of plaintiff's ideas as a work of authorship fixed in a tangible medium of expression is eligible for copyright protection.

---

22. "Sound recordings" are defined as "works that result from the fixation of a series of musi-

cal, spoken, or other sounds ..." 17 U.S.C. § 101.

 The fundamental issue thus becomes whether plaintiff or Infinity is entitled to the copyright protection afforded to those Loveline programs that were simultaneously recorded. In general, copyright in a work "vests initially in the author . . . of the work." 17 U.S.C. § 201(a). However, "[i]n the case of a work made for hire, the employer . . . for whom the work was prepared is considered the author . . ., and, unless the parties have expressly agreed otherwise in a written instrument signed by them, owns all of the rights comprised in the copyright." 17 U.S.C. § 201(b).

A "work made for hire" is defined as "a work prepared by an employee within the scope of his or her employment." 17 U.S.C. 101. Here, it is evident that (1) the copyrightable interest was created in the scope of plaintiff's employment and (2) plaintiff does not plead the existence of any written agreement "expressly" naming him as owner of the programs. Pursuant to Section 201(b), therefore, the employer, Infinity L.A., is considered the author of the work and owns the copyright interest in the recorded programs.[23]

 Moreover, Infinity L.A., as owner of the Loveline copyright interest, also owns the exclusive right to prepare and broadcast "derivative" works based on existing Loveline programs.[24] The owner of the copyright has the exclusive right to prepare derivative works based upon the copyrighted work. 17 U.S.C. § 106(2). All future Loveline programs fall within the scope of derivative works. See Lone Ranger Television, Inc. v. Program Radio Corp., 740 F.2d 718, 721–23 (9th Cir.1984).

 Plaintiff alleges that before the show began airing he granted KROQ a license to use the "Loveline Property." He also claims that there was a superseding oral contract to his second three-year contract with Infinity L.A. acknowledging his creation and exclusive right to perform Loveline. Complaint, ¶ 346.

However, even assuming that the "Loveline Property" had a protectable copyright interest prior to its being broadcast and simultaneously recorded, which this Court has found it did not, Section 204(a) of the Copyright Act would operate as a statute of frauds against these claims. A transfer of copyright ownership must be in writing and be signed by the owner of the rights. 17 U.S.C. § 204(a). "The rule is really quite simple: If the copyright holder agrees to a transfer of ownership to another party, that party must get the copyright holder to sign a paper saying so." Effects Associates, Inc. v. Cohen, 908 F.2d 555, 557 (9th Cir.1990), cert. denied, 498 U.S. 1103, 111 S.Ct. 1003, 112 L.Ed.2d 1086 (1991). Here, plaintiff has no written instrument documenting his "granting" of a license to KROQ, and does not present a writing challenging Infinity's registered trademark.

### B) "Loveline" Title and Jingle

 Plaintiff contends that he has an interest in the title "Loveline" and the "Loveline Jingle." However, the regulations of the Copyright Office expressly provide that "[w]ords and short phrases such as names, titles and slogans" are not subject to copyright. 37 C.F.R. § 202.1(a). Thus, "titles, in and of themselves, cannot claim statutory copyright." Shaw v. Lindheim, 919 F.2d 1353, 1362 (9th Cir.1990). And were it copyrightable, the title "Loveline" would in any

---

**23.** Infinity, parent corporation to Infinity L.A., has also been the owner of the Loveline mark since acquiring KROQ in 1986. Accordingly, Infinity received a certificate of trademark registration from the Patent and Trademark Office on January 9, 1990. Infinity received Certificate of Registration, No. 1576858, dated January 9, 1990. See Reeb Declaration, Exhibit C. Pursuant to Fed.R.Evid. 201, the Court takes judicial notice of this fact.

Defendants also request judicial notice of the fact that, as reported in the New York Post on November 23, 1992, Infinity has actively asserted its right to the mark against others. See Reeb Declaration, Exhibit D. While the newspaper article supports defendants' assertion, this Court finds that this issue could still be subject to reasonable dispute and, in any event, is not necessary to deciding the instant motion. Accordingly, the Court declines to take judicial notice of facts based on Exhibit D.

**24.** In 17 U.S.C. § 101, a "derivative work" is defined as "a work based upon one or more preexisting works."

event come under the "works made for hire" provision of § 201(b).

Plaintiff's asserted interest in the "Loveline Jingle" consists of the word "Loveline" sung with an exaggerated emphasis and high pitch on the first syllable, and a low pitch on the second. "[A] work must contain at least a minimum amount of creative musical expression." Draft Compendium of Copyright Office Practices, § 404.

■■■ Not having been presented with a recording of the "composition" in question, this Court cannot assess whether the jingle reaches the requisite level of creativity. However, the issue is moot. As with the title "Loveline" and plaintiff's other asserted "interests," the jingle falls under the "work made for hire" provision of § 201(b). And were the jingle copyrightable, it would in any event belong to Infinity, not to plaintiff. 17 U.S.C. § 201(b). Furthermore, plaintiff has failed to plead the existence of a writing transferring ownership in the jingle to him.

### c) Constitutionality of the Federal Copyright Statute

Plaintiff argues that the Federal Copyright Act, 17 U.S.C. § 101 et seq., is unconstitutional to the extent it preempts state laws which protect materials left uncovered by the federal statute. He contends that because the Copyright Clause of the Constitution[25] empowers Congress to protect only "writings," any attempt to prevent states from protecting ideas would be unconstitutional.

■■■ However, California Civil Code 980(a)(1) does not protect ideas, but rather only the representation or expression of original works which are not fixed in any tangible medium of expression. As discussed above, the statute steers clear of any legal or equitable rights created under federal law, and thereby avoids federal preemption under 17 U.S.C. § 301(a). Furthermore, courts have regularly upheld the constitutionality of the Copyright Act and its preemptive effects. See, e.g., Bonito Boats, Inc. v. Thunder Craft Boats, Inc., 489 U.S. 141, 151–52, 109 S.Ct. 971, 977–78, 103 L.Ed.2d 118 (1989). Plain-

tiff's constitutional argument is therefore without relevance and merit.

### d) Conclusion

This Court finds that plaintiff's Sixth Cause of Action arises under federal law to the extent the Loveline shows were simultaneously recorded and that Infinity has been the owner of the copyright interest in the Loveline program since it acquired KROQ in 1986. Because plaintiff has neither alleged the existence of a writing expressly naming him owner of the Loveline copyright nor challenged the assertion that Loveline was simultaneously taped when broadcast over KROQ, no genuine issues of material fact remain regarding the copyright infringement claim as to those programs which were simultaneously recorded. Accordingly, defendants are GRANTED summary judgment as to plaintiff's Sixth Cause of Action.

## IV. PLAINTIFF'S REMAINING CAUSES OF ACTION

■■■ In addition to copyright infringement, plaintiff has pled 19 state law causes of action. A district court may, at its discretion, decline to exercise supplemental jurisdiction over remaining state law claims where it has dismissed all claims over which it has original jurisdiction. 28 U.S.C. § 1367(c)(3). Here, this Court has found the plaintiff's copyright infringement cause of action presents a federal question to the extent Loveline was simultaneously recorded. The Court may accordingly decline to exercise supplementary jurisdiction over the remaining state causes of action, as doing so would most sensibly serve the values of economy, convenience, fairness and comity. See Executive Software North America, Inc. v. U.S.D.C., 24 F.3d 1545 (9th Cir.1994).

However, the Copyright Act of 1976 (17 U.S.C. § 101 et seq.) describes in § 301 the extent to which the Act preempts state law causes of action based on copyright. Under Section 301, all rights granted under state law are preempted if they (1) come within the "subject matter of copyright" as defined in Sections 102 and 103 and (2) are "equiva-

---

25. *Supra* at note 16.

lent" to any of the exclusive rights within the general scope of copyright as defined in Section 106 of the Act.[26] *Del Madera Properties v. Rhodes and Gardner, Inc.,* 820 F.2d 973, 976 (9th Cir.1987) (citations omitted). Thus, to survive preemption, the essence of a state law cause of action must derive from something beyond the alleged unauthorized use of a copyrighted work, and must protect rights qualitatively different from the assertion of copyright rights. *Id.* at 977; *Motown Records Corp. v. George A. Hormel & Co.,* 657 F.Supp. 1236, 1240 (C.D.Cal.1987).

The Nimmer copyright treatise articulates the test for preemption as follows:

> [A] right which is "equivalent to copyright" is one which is infringed by the mere act of reproduction, performance, distribution or display. The fact that the state-created right is either broader or narrower than its federal counterpart will not save it from preemption.... [I]f under state law the act of reproduction, performance, distribution or display, ... will in itself infringe the state created right, then such right is preempted. But if qualitatively other elements are required, instead of or in addition to the acts of reproduction, performance, distribution or display, in order to constitute a state created cause of action, the right does not lie "within the scope of copyright," and there is no preemption.

1 M. Nimmer, *Nimmer on Copyright,* § 1.01[B][1] at 1–14–15 (1993).

At first glance, all the remaining state law causes of action may be dismissed for failing to state a claim upon which relief can be granted in that a required element for each of them, plaintiff's having a copyright interest in Loveline, has been found not to exist. However, in a more basic sense, this Court must initially consider whether the remaining causes of action are preempted by the federal Copyright Act for not pleading anything in essence beyond the defendants' alleged unauthorized use of a copyrighted work.

*a) Property Rights Claims*

Of plaintiff's 19 state law causes of action, some may be classified as property-based claims in that they are based entirely upon plaintiff's owning the Loveline format. These causes of action are pled as follows:

1) Unfair Competition (Fifth Cause of Action)

2) Conversion (Twelfth Cause of Action)

3) Conspiracy to Commit Conversion (Thirteenth Cause of Action)

4) Slander of Title I—Property (Fourteenth Cause of Action)

5) Interference with Prospective Economic Advantage (Sixteenth Cause of Action)

6) Breach of Fiduciary Duty (Seventeenth Cause of Action)

7) Declaratory Relief (Nineteenth Cause of Action—Ownership of Trade Names and Format)

8) Injunctive Relief (Twentieth Cause of Action—Ownership of Trade Names and Format)

9) Slander of Title II—Services (Fifteenth Cause of Action)

After carefully reviewing plaintiff's complaint and in particular these property-based causes of action, this Court finds that these causes of action in essence merely assert a protectable copyright interest in the Loveline format and defendants' unauthorized use thereof. They are therefore not qualitatively different from plaintiff's copyright infringement claim, and accordingly are preempted under Section 301 of the Copyright Act. *See, e.g., Del Madera, supra; Litchfield v. Spielberg,* 736 F.2d 1352 (9th Cir.1984), *cert. denied* 470 U.S. 1052, 105 S.Ct. 1753, 84 L.Ed.2d 817 (1985). These causes of action are hence DISMISSED pursuant to Rule 12(b)(6) as to those Loveline programs which were simultaneously recorded.

If a court grants a Rule 12(b)(6) motion, leave to amend should be denied only if the court determines that "allegations of other facts consistent with the challenged pleading could not possibly cure the defect." *Schreib-*

---

**26.** The subject matter of copyright is comprised of those original works of authorship fixed in any tangible medium of expression. 17 U.S.C. § 102(a). The scope of copyright includes derivative works based upon the copyrighted work. 17 U.S.C. § 106(2).

*er District v. Serv–Well Furniture Co.,* 806 F.2d 1393, 1401 (9th Cir.1986). Because each of these causes of action depend on plaintiff's asserted copyright interest in Loveline, which this Court has found to be invalid, plaintiff cannot possibly cure the defects in these causes of action. Accordingly, they are DISMISSED.

*b) Contract Claims*

■ The remainder of plaintiff's causes of action may be classified as contract-related claims in that they stem from defendants' alleged breaching of contractual agreements with plaintiff. These causes of action are pled as follows:

1) Breach of Express Contract (First Cause of Action)

2) Breach of Implied Contract (Second Cause of Action)

3) Quantum Meruit (Third Cause of Action)

4) Quantum Valebant (Fourth Cause of Action)

5) Breach of Employment Contract (Seventh Cause of Action)

6) Wrongful Constructive Termination (Eighth Cause of Action)

7) Failure to Pay Wages (Ninth Cause of Action)

8) Fraud (Tenth Cause of Action)

9) Conspiracy to Commit Fraud (Eleventh Cause of Action)

10) Rescission or Reformation (Eighteenth Cause of Action)

11) Declaratory Relief (Nineteenth Cause of Action—Employment Contract)

12) Injunctive Relief (Twentieth Cause of Action—Employment Contract)

In these contract-related causes of action, plaintiff alleges that: (1) his employers agreed to provide him compensation for his ideas; and (2) over the years, the parties modified their agreements so that, *inter alia,* plaintiff's compensation would increase as Loveline grew in popularity and was broadcast more frequently.

■ As discussed above, Section 301 preempts those state law rights which are in essence reformulated allegations of unauthorized use of a copyrighted work. However, while an idea in and of itself is not subject to copyright under California law, recovery for the appropriation of an idea may be had on a contractual theory if its disclosure is exchanged in consideration for a contract. *Whitfield v. Lear,* 751 F.2d 90 (2nd Cir.1984); *Donahue v. Ziv Television Programs, Inc.,* 245 Cal.App.2d 593, 601, 54 Cal.Rptr. 130, 137 (1966). So, although "[r]ecovery for the use of an idea must be based on an express or implied in fact contract," and "the law will not imply a promise, never made expressly or impliedly, to pay for something which [could be had] for the taking," *Id.,* a contract-based claim must allege nothing more than an act of copyright infringement to be preempted. *See National Car Rental v. Computer Associates,* 991 F.2d 426, 432 (8th Cir.1993).

Here, this Court finds that plaintiff has pled his contract-based causes of action as predicated upon a copyright interest in the Loveline format. Since this Court has found that plaintiff possesses no such interest for those programs which were simultaneously recorded, these causes of action lack a required element, and as such fail to state a claim upon which relief can be granted.

However, in terms of preemption, the contract-based causes of action do allege more than the unauthorized use of a copyrighted work. They also claim that there has been a breach of an underlying contract between the parties based on plaintiff's ideas for Loveline. As such, these causes of action are qualitatively different from the copyright infringement claim. By focusing on the alleged breach of contract and avoiding any assertion of a copyright interest in the simultaneously recorded Loveline programs, these claims can be made to adequately assert state law causes of action. Accordingly, plaintiff's contract-based causes of action are DISMISSED WITHOUT PREJUDICE. Plaintiff may refile his contract-based causes of action in state court devoid of any underlying copy-

right-related claims in the simultaneously recorded programs.[27]

### V. CONCLUSION

As discussed above, it is uncontroverted that defendants have simultaneously recorded at least 198 tapes of Loveline programs. However, it is not incontrovertibly established exactly how many of the Loveline programs were fixed in a tangible form and therefore subject to the federal Copyright Act and dismissal. Some shows apparently were taped, and some were not.

Accordingly, for the reasons discussed above, defendants are GRANTED SUMMARY JUDGMENT on plaintiff's Sixth Cause of Action pursuant to Fed.R.Civ.P. 56. Plaintiff's Causes of Action Five, Twelve, Thirteen, Fourteen, Fifteen, Sixteen, Seventeen, Nineteen (B) and Twenty (B) are DISMISSED WITH PREJUDICE. Causes of Action One, Two, Three, Four, Seven, Eight, Nine, Ten, Eleven, Eighteen, Nineteen (A) and Twenty (A) are DISMISSED WITHOUT PREJUDICE and, barring the assertion of any underlying property or copyright rights, may be repled in state court.

But, if plaintiff so desires, he may amend this complaint and bring causes of action based solely upon those Loveline programs shown to not have been simultaneously recorded. Such a complaint would not raise a federal question and would therefore be remanded to state court.

**IT IS SO ORDERED.**

---

**27.** To the extent these causes of action when repled continue to allege a copyright interest in the simultaneously recorded Loveline programs, defendants will be justified in removing them to this Court and seeking their dismissal.