**ProCD, INC., Plaintiff,**

v.

**Matthew ZEIDENBERG, and Silken Mountain Web Services, Defendants.**

No. 95–C–0671–C.

United States District Court, W.D. Wisconsin.

Jan. 4, 1996.

Michael J. Lawton, Lathrop & Clark, Madison, WI, for ProCD, Inc.

David A. Austin, Garvey & Associates, Madison, WI, for Matthew Zeidenberg, Silken Mountain Web Services, Inc.

Christopher Dodge, Tomlinson, Gillman & Rikkers, S.C., Madison, WI, for Ivory Tower Information Systems.

## OPINION AND ORDER

CRABB, Chief Judge.

This is a civil action for injunctive and monetary relief brought pursuant to the federal Copyright Act, 17 U.S.C. §§ 101–1010, the Wisconsin Computer Crimes Act, Wis. Stat. § 943.70, and Wisconsin contract and tort law. The facts are not in dispute. Defendants Matthew Zeidenberg and Silken Mountain Web Services, Inc., a one-person corporation formed by Zeidenberg, purchased copies of plaintiff's Select Phone™ CD–ROM software program, downloaded telephone listings stored on the CD–ROM discs to Zeidenberg's computer and made the listings available to Internet users by placing the data onto an Internet host computer.

Plaintiff contends that defendants' actions constitute copyright infringement, breach of the express terms of the parties' software licensing agreement, a violation of Wisconsin's Computer Crimes Act, misappropriation and unfair competition. Defendants argue that the data they downloaded from plaintiff's Select Phone™ program were not protected by copyright, that defendants did not use Select Phone™ in a manner inconsistent with plaintiff's copyright, that they are not bound by the software licensing agreement and that plaintiff's state law claims are preempted by federal copyright law.

The case is before the court on the parties' cross motions for summary judgment. Jurisdiction is present under 28 U.S.C. § 1331, because plaintiff's copyright claim arises under federal law, and under 28 U.S.C. § 1332, because there is complete diversity of citizenship among the parties and more than $50,000 is at issue.

I conclude that defendants are entitled to summary judgment in their favor. First, defendants did not infringe plaintiff's copyright. Although the software plaintiff developed for its Select Phone™ program is protected by copyright, that protection does not extend to the telephone listings included on the CD–ROM discs. Second, defendants used the protected software for their own individual purposes, consistent with plaintiff's copyright, and distributed only unprotected data. Defendants never assented to the license agreement included in the Select Phone™ user guide and are not bound by it. Even if defendants had assented, the license agreement is preempted by federal copyright law to the extent plaintiff intended it to apply to uncopyrightable data. Finally, plaintiff's remaining state law claims are preempted by the Copyright Act because they are attempts to avoid federal copyright law.

From the facts proposed by the parties, I find that the following facts are not in dispute.

## UNDISPUTED FACTS

Plaintiff ProCD, Inc., is a Delaware corporation with its principal place of business in Danvers, Massachusetts. Defendant Matthew Zeidenberg is a Wisconsin citizen residing in Madison, Wisconsin, and working on a Ph.D. in computer science. Defendant Silken Mountain Web Services, Inc., is a Wisconsin corporation incorporated by defendant Zeidenberg on April 27, 1995, with himself as president and sole shareholder.

Plaintiff spent millions of dollars creating a comprehensive, national directory of residential and business listings. Plaintiff compiled over 95,000,000 residential and commercial listings from approximately 3,000 publicly available telephone books. The listings include full names, street addresses, telephone numbers, zip codes and industry or "SIC" codes where appropriate. Plaintiff sells these listings on CD–ROM discs under the trademark "Select Phone™," as well as under other trade names and trademarks.

Each of plaintiff's CD–ROM discs contains both telephone listings and a software program used to access, retrieve and download the data. Plaintiff sells Select Phone™ in boxes containing a set of discs and a user guide. The user guide includes a series of terms entitled, "Single User License Agreement." The agreement states in its opening paragraph:

> Please read this license carefully before using the software or accessing the listings contained on the discs. By using the discs and the listings licensed to you, you agree to be bound by the terms of this License. If you do not agree to the terms of this License, promptly return all copies of the software, listings that may have been exported, the discs and the User Guide to the place where you obtained it.

The license informs the user that plaintiff's software is copyrighted and that copying the software is authorized only for particular purposes and uses. Once the product is installed on the user's computer, the computer screens remind users that use of the product and the data is subject to the Single User License Agreement and that the products are licensed for authorized use only. Before a user can access the listings a field appears on the computer screen, stating:

> The listings contained within this product are subject to a License Agreement.

Please refer to the Help menu or to the User Guide.

In addition, most screens contain the following warning:

The listings on this product are licensed for authorized users only. The user agreement provides that copying of the software and the data may be done only for individual or personal use and that distribution, sublicense or lease of the software or the data is prohibited. The agreement provides expressly that:

[Y]ou will not make the Software or the Listings in whole. or in part available to any other user in any networked or time-shared environment, or transfer the Listings in whole or in part to any computer other than the computer used to access the Listings.

The Select Phone™ box mentions the agreement in one place in small print. The box does not detail the specific terms of the license.

In late 1994, defendant Zeidenberg purchased a copy of Select Phone™ at a local retail store. In February or March 1995, defendant Zeidenberg decided he could download data from Select Phone™ and make it available to third parties over the Internet for commercial purposes. Zeidenberg purchased an updated version of Select Phone™ in March 1995 and in April 1995, incorporated Silken Mountain Web Services, Inc. for the purpose of making a database of telephone listings available over the Internet. In April and May 1995, after incorporation, Silken Mountain Web Services, Inc., began assembling its own telephone listings database, part of which contained data from Select Phone™ and part of which involved data from another company's product. Defendants were aware of the computer screen warning message notifying them that Select Phone™ was subject to the agreement contained in the user guide. Defendants disregarded the screen warnings because they did not believe the license to be binding.

Defendant Zeidenberg is the sole shareholder, sole employee and sole officer of defendant Silken Mountain Web Services, Inc. Defendants compiled their database by installing Select Phone™ on Zeidenberg's personal computer, thereby making a copy of the software onto Zeidenberg's computer's hard drive. Defendants used the software on this hard disk copy to download data from the Select Phone™ discs to contribute to the corporation's own database. Every time defendants downloaded data from the discs, an additional copy of Select Phone™ software was copied into the random access memory (RAM) of Zeidenberg's computer.

Defendant Silken Mountain Web Services, Inc., wrote its own computer program to allow users to search its database. No person who accessed the Silken Mountain Web Services, Inc. home page used or copied plaintiff's Select Phone™ software. The software that defendants created permits searches based only on name or standard industrial code while plaintiff's software can search a number of "fields," such as name, address, telephone number, area code, zip code, or any combination of the above.

In May 1995, defendants entered into a contract with Branch Information Systems pursuant to which Branch provided defendants with access to the Internet. Defendants uploaded their database onto Branch Information Systems' computer and provided access to the database to third parties via the Internet. Plaintiff discovered this activity and demanded that defendants discontinue their actions immediately. Zeidenberg wrote to plaintiff and admitted downloading listings from Select Phone™ and making some of those listings available over the Internet but explained that he would continue his project.

After learning of plaintiff's displeasure, Branch Information Services stopped doing business with defendants. In August 1995, defendants entered into a contract with Ivory Tower Information Services for Internet access. The parties contemplated that plaintiff would complain and they provided in the contract that Ivory Tower Information Services was required to continue providing defendants Internet access until ordered by a court to stop.

Pursuant to this contract, defendants made their database available over the Internet until this court issued a preliminary injunction on September 22, 1995. Prior to entry

of the preliminary injunction, defendants' database was receiving approximately 20,000 "hits" per day on the Internet. (A hit occurs each time a new screen is displayed on a user's computer screen during a search of the database. Each search tends to generate multiple hits.) For each search of defendants' database, users are permitted to extract up to 1,000 listings. Because the public could access defendants' database for free, plaintiff believed its ability to sell Select Phone™ was jeopardized.

## OPINION

Plaintiff commenced this law suit in September 1995 and immediately sought a preliminary injunction barring defendants from distributing Select Phone™ telephone listings over the Internet. At the hearing on its motion for a preliminary injunction, plaintiff's arguments for protection of its entrepreneurial effort were sufficiently compelling to secure the injunction. Nonetheless, it was clear then, as it is now, that plaintiff had no valid claim to federal copyright protection for the raw data contained on its Select Phone™ CD–ROM discs. Now, after the parties have briefed the issues more fully, it has become evident that plaintiff cannot prevail on its copyright claim even with respect to its protected software and that its state law claims are similarly unavailing. Plaintiff's arguments boil down to the proposition that it is unfair and commercially destructive to allow defendants to take the information plaintiff assembled with a significant investment of time, effort and money and use it for commercial purposes without paying any compensation to plaintiff. Although the proposition has substantial equitable appeal, it is one that the United States Supreme Court rejected specifically in a nearly identical context four years ago. In *Feist Publications, Inc., v. Rural Telephone Service Co., Inc.,* 499 U.S. 340, 111 S.Ct. 1282, 113 L.Ed.2d 358 (1991), the court held that telephone listings are not protected by copyright law and denied the claim of a telephone company that sought to prevent competitors from using the data it had compiled and published in its directories. If this result seems perverse, the remedy lies with Congress. *See* Maureen A. O'Rourke, 41 Fed.B.News & J. 511

(1994) (rapidly expanding Internet use will force Congress to address difficult question of appropriate level of protection for on-line fact-based databases); Jane C. Ginsburg, *No "Sweat"? Copyright and Other Protection of Works of Information after Feist v. Rural Telephone,* 92 Colum.L.Rev. 338 (suggesting a federal misappropriation statute to prevent commercial copying of non-copyrightable databases by other compilers if public access to information were assured through collective licensing).

It is not surprising that the recent explosive growth of the Internet would give rise to lawsuits concerning the ownership of the data available through that system. *See* Jane C. Ginsburg, *Putting Cars on the "Information Superhighway": Authors, Exploiters, and Copyright in Cyberspace,* 95 Colum.L.Rev. 1466 (1995). Defendant Zeidenberg is not the first computer student to find himself involved in a legal dispute after downloading information and offering it over the Internet. In *United States v. LaMacchia,* 871 F.Supp. 535 (D.Mass.1994), a Massachusetts Institute of Technology student set up a computer bulletin board and encouraged his correspondents to upload copyrighted software that other users could download for free. The United States charged the student with criminal copyright infringement under the federal wire fraud statute, 18 U.S.C. § 1343. The district court noted the impropriety of the defendant's actions but held that his conduct was not punishable under the wire fraud statute; copyright law provided the full range of penalties for criminal infringement actions and copyright law did not cover defendant's noncommercial activities. *Id.* at 544–45. The *LaMacchia* decision appears to have generated congressional interest. On August 4, 1995, Senator Patrick Leahy introduced a bill (S. 1122) to ensure better copyright protection for creative works available on line. *Bill to Stiffen Criminal Penalties for Copyright Infringement Introduced,* 7 Journal of Proprietary Rights 26 (1995). The executive branch is also well aware of these problems. A presidential study group formed in 1993 recently released a report entitled, "Intellectual Property and the National Information Infrastructure."

The report suggests that the Internet will not flourish if significant protection against theft and copyright abuse is not offered. Guy Alvarez, *New Legal Issues on the Net*, Am.Law. 28, 29 (Dec.Supp.1995). Against this background, I will take up plaintiff's federal copyright claim.

### A. *Copyright Infringement*

Select Phone™ is comprised of two elements: 1) the software that allows users to access and retrieve the data contained on the CD–ROM discs; and 2) the data itself. The difference between these two elements. is critical. Plaintiff contends that defendants infringed plaintiff's copyright when they copied and used Select Phone™ for purposes of commercially distributing the listings on the Internet because copyright protection extends to both the telephone listings and to its software. Defendants argue that the Select Phone™ data is not copyrightable but acknowledge that plaintiff has a valid copyright in the Select Phone™ software. Nonetheless, defendants contend, copyright law permits them to make a copy of the program as long as it is essential to their personal use of the program and is not used in a manner inconsistent with plaintiff's copyright.

### 1. *Select Phone™ data*

In *Feist Publications, Inc. v. Rural Telephone Service Co. Inc.*, 499 U.S. 340, 111 S.Ct. 1282, 113 L.Ed.2d 358, the Supreme Court held that a telephone company's white pages were not entitled to copyright protection because the raw data contained in the listings were not arranged in an original manner and lacked the minimal degree of creativity necessary to constitute a copyrightable compilation of facts. *Id.* at 362, 111 S.Ct. at 1296. As the Court noted, *Feist* concerned "the interaction of two well-established propositions. The first is that facts are not copyrightable; the other, that compilations of facts generally are." *Id.* at 344, 111 S.Ct. at 1287. Even a modicum of originality may suffice to make a compilation of fact copyrightable, but the alphabetical listing of telephone subscriber addresses and telephone numbers does not achieve even this minimal degree of creativity. *Id.* at 345, 111 S.Ct. at 1287. To the argument that it was unfair for the publishing company to use the fruits of the telephone company's labor without compensating it, the Court gave short shrift. "The primary objective of copyright is not to reward the labor of authors, but '[t]o promote the Progress of Science·and Useful Arts.'" *Id.* at 349, 111 S.Ct. at 1290 (citing U.S. Const. art. I, § 8, cl. 8). In reaching this conclusion, the Court rejected a line of cases applying a "sweat of the brow" theory that offered copyright protection to factual compilations as a reward for the hard work that goes into compiling facts. *Id.* at 352, 111 S.Ct. at 1291. The Court explained that the 1976 Copyright Act overruled the "sweat of the brow" cases. *Id.* at 354–55, 111 S.Ct. at 1292. The Court's overruling of the "sweat of the brow" theory can be viewed as implementation of Congressional intent with respect to federal copyright law.

Plaintiff does not suggest that the phone listings contained in Select Phone™ are any different from those in *Feist* for purposes of copyright protection. As a collection of facts arranged in a commonplace, non-original fashion, the Select Phone™ listings themselves are not copyrightable. Without originality, time and effort do not factor into the copyright equation. *Feist's* result may well serve as a disincentive to companies considering the compilation of factual databases, *see* Philip H. Miller, Note, *Life after Feist: Facts, the First Amendment and the Copyright Status of Automated Databases*, 60 Fordham L.Rev. 507, 521–23 (1991) (*Feist* chills incentive to create databases), but *Feist* struck the "careful balance" between fact and expression in copyright law by allowing facts to be copied at will in order to advance the development of science and art. That disincentives might result was not considered important.

### 2. *Select Phone™ software*

Although the Select Phone™ data are not protected by federal copyright law, the protection attaches to the software component, which does represent original expression and creativity. The question is whether defendants infringed this copyright by copying the Select Phone™ software to Zeidenberg's computer's hard drive for the purpose

of offering the telephone listings over the Internet. If, as defendants argue, they copied the software only for personal use and never distributed the software to third parties, they may be entitled to the exception from infringement set out in 17 U.S.C. § 117.

■ Section 501 of the Copyright Act, 17 U.S.C. § 501, proscribes any unauthorized copying of a copyrighted work. A claim for copyright infringement requires proof of 1) plaintiff's ownership of a valid copyright; and 2) defendant's copying of original elements of plaintiff's work. *Wildlife Express Corp. v. Carol Wright Sales, Inc.*, 18 F.3d 502, 507 (7th Cir.1994). Section 117 of the Copyright Act, 17 U.S.C. § 117, offers an important exception to restrictions on copying protected computer software. It provides, in relevant part:

> [I]t is not an infringement for the owner of a copy of a computer program to make ... another copy or adaptation of that computer program provided:
>
> (1) that such new copy or adaptation is created as an essential step in the utilization of the computer program in conjunction with a machine and that it is used in no other manner ...

Congress passed § 117 in 1980 in recognition of the fact that computer users might need to make copies of computer software in order to utilize that software. *Apple Computer, Inc. v. Formula Int'l, Inc.*, 594 F.Supp. 617, 621 (C.D.Cal.). Although legislative history surrounding the passage of § 117 is sparse, it appears that Congress sought to implement the recommendations of CONTU, the National Commission on New Technological Uses of Copyright Works. *Aymes v. Bonelli*, 47 F.3d 23, 26 (2d Cir. 1995) (citing H.R.Rep. No. 1307, 96th Cong., 2d Sess., Pt. I, at 23 (1980), *reprinted in* 1980 U.S.C.C.A.N. 6460, 6482). CONTU suggested that:

> The intent of that section [117] is to provide a legitimate holder of a computer program with permission to do that copying of the program which is necessary for him to be able to use it in his computer without running afoul of possible infringement actions.

*Apple Computer*, 594 F.Supp. at 621 (citing CONTU Meeting No. 19 at 98–99 (Jan.1978)).

■ The parties' dispute focuses on the scope and meaning of the term, "essential step." Plaintiff would interpret it as not extending to the copying of Select Phone™ onto a computer's hard drive. Plaintiff contends that making a copy of Select Phone™ on a hard drive was not "essential" to defendants' use of the program: they could have utilized the program by booting it into RAM memory every time they desired to use it. According to plaintiff, hard drive copies are not protected under § 117.

■ RAM is an acronym for Random Access Memory and represents that part of a computer's memory in which data and computer programs can be recorded temporarily. When a computer is turned off, the information stored in RAM is lost. *See Apple Computer*, 594 F.Supp. at 622. A number of courts have determined that RAM copies of a computer program are copies for the purposes of § 117. *See MAI Sys. Corp. v. Peak Computer, Inc.*, 991 F.2d 511, 518 (9th Cir. 1993), *cert. denied,* — U.S. ——, 114 S.Ct. 671, 126 L.Ed.2d 640 (1994); *Advanced Computer Services of Michigan, Inc., v. MAI Sys. Corp.*, 845 F.Supp. 356, 363, 364 n. 9 (E.D.Va.1994) (collecting cases); *Apple Computer*, 594 F.Supp. at 622. However, none of these courts has held that hard drive copies made for an owner's individual use are not equally "essential" under the rubric of § 117. Plaintiff's logic would lead to the conclusion that any copying of a computer program onto the owner's hard drive would constitute copyright infringement unless the program developer gave the owner specific authorization to make a hard drive copy. This conclusion conflicts with both basic patterns of computer use in the 1990s and the spirit of § 117. The day has passed when it was necessary to insert a floppy disk in a disk drive any time a user wanted access to a particular program. Today, computer users store many of their programs on hard drives and access them from that part of the computer's permanent memory. Programs on CD–ROM can be used more efficiently by installing the program software on a hard drive and then

using that hard drive copy in conjunction with a disc inserted in the CD–ROM disc drive. Limiting those copies that are considered "essential" under § 117 to RAM copies would limit the use of computer hard drive copies, flout the purposes of § 117 and diminish the sales appeal of any new program that took advantage of such protection. *See* Robert A. Kreiss, *Section 117 of the Copyright Act,* 1991 B.Y.U.L.Rev. 1497, 1524–26 (1991) (contending that position that hard drive copies are not "essential" for purposes of § 117 would create incredible frustration by requiring the continual swapping of floppy disks and should be rejected as "rather ridiculous").

■ Section 117 is intended to allow persons in rightful possession of copies of a program to use them freely without fear of exposure to copyright liability. *Aymes,* 47 F.3d at 26 (citing CONTU Final Report at 31 (1978)). If copyright law prevented computer users from making hard drive copies, they would not be able to use their purchased programs without fear of infringement. RAM copies may be essential copies of a computer program but hard drive copies are just as essential for the effective use of today's computer software.

■ Copies permitted by § 117 must be made only for an owner's personal use, *Aymes,* 47 F.3d at 26. Odd as it may seem, given defendants' subsequent commercial use of the telephone data, the undisputed fact is that defendants made no copies of plaintiff's software except for their own personal use. Defendants did not use the software in an unauthorized fashion as suggested by plaintiffs' citations to *Pinkham v. Sara Lee Corp.,* 983 F.2d 824 (8th Cir.1992) and *Major League Baseball Promotion Corp. v. Colour–Tex, Inc.,* 729 F.Supp. 1035 (D.N.J.1990). They used the copyrightable software portion of the product only to access and download the telephone listings data. Defendants did not offer this software over the Internet. Instead, they created a new search program to allow Internet users to access the data. In distributing only the uncopyrightable data over the Internet, defendants did not disqualify themselves from the infringement exception contained in § 117.

In reaching the conclusion that defendants did not misuse the copyrightable component of the Select Phone™ program, it is not necessary to adopt the broad proposition asserted by the defendant in *Vault Corp. v. Quaid Software Ltd.,* 847 F.2d 255, 261 (5th Cir.1988), that software purchasers are free under § 117 to make copies of copyrighted software for purposes not intended by the copyright owner. In *Vault,* the defendant used the plaintiff's software diskettes, designed to prevent the unauthorized duplication of programs placed on them, for the express purpose of devising a means to defeat the diskettes' protective function, rather than for their intended protective purposes. *Id.* The plaintiff asserted that the phrase "and that it is used in no other manner" in § 117 means that the statute's protection should not extend to copies made for purposes other than those for which the program was intended. *Id.* The court held that the defendant did not infringe the plaintiff's copyright, finding that § 117 contains no language to suggest that the copy it permits must be put to the use intended by the copyright owner and that no clear congressional intent existed to the contrary. *Id.* Here, defendants used Select Phone™ exactly as plaintiff intended: to access and download data. There is no obvious reason not to extend the § 117 exception to parties who copy a copyrighted software program for its intended purpose and use it in that manner.

Although plaintiff acknowledges the distinction between the copyrighted and noncopyrighted portions of Select Phone™, it disregards that distinction to some extent. For example, plaintiff argues that defendants' actions are tantamount to downloading all of Lexis's judicial opinions and offering them for free over the Internet. Plaintiff fails to recognize that although federal cases are not copyrightable, at least one court has held that legal database companies like Lexis may arrange those opinions in such a manner as to receive copyright protection. *See West Publishing Co. v. Mead Data Central, Inc.,* 799 F.2d 1219 (8th Cir.1986), *cert. denied,* 479 U.S. 1070, 107 S.Ct. 962, 93 L.Ed.2d 1010 (1987) (West's arrangement of legal decisions en-

tails enough intellectual labor and originality to receive copyright protection); *but see* Craig Joyce and L. Ray Patterson, *Monopolizing the Law: The Scope of Copyright Protection for Law Reports and Statutory Compilations*, 36 UCLA L.Rev. 719 (1989) (criticizing the *West* decision). Unlike West's arrangement of judicial opinions, plaintiff's arrangement of telephone listings lacks the minimal level of creativity necessary to garner copyright protection. *See Feist*, 499 U.S. at 362, 111 S.Ct. at 1296. Although plaintiff's software is protected by copyright law, its compiled data are not. Because defendants used the software only to download and access the data and did not further distribute this copyrightable information, their actions are protected by § 117.

▬ Defendants contend that the fair use doctrine of 17 U.S.C. § 107 provides them the right to make an intermediate copy of a protected work in order to get at the uncopyrighted parts of a work. *See Sega Enterprises Ltd. v. Accolade, Inc.*, 977 F.2d 1510, 1520 (9th Cir.1992); *Atari Games Corp. v. Nintendo of America, Inc.*, 975 F.2d 832, 843 (Fed.Cir.1992). The fair use doctrine establishes a defense to an otherwise valid copyright infringement claim. *Sega*, 977 F.2d at 1521. Because I have determined that defendants are protected from a copyright infringement claim by § 117, it is unnecessary to consider whether they should receive § 107 protection as well.

### B. *Software License Agreement*

▬ Before marketing Select Phone™, plaintiff recognized the potential limitations of copyright law and included an agreement in the software package that sought to impose limitations concerning the distribution and use of the telephone listings. Plaintiff is not the first software producer to seek to protect itself in this fashion. Software companies have included such agreements, commonly known as "shrinkwrap licenses," with their products since the advent of mass market software. (The term "shrinkwrap" refers to the transparent plastic in which mass market software is encased. Mark A. Lemley, *Intellectual Property and Shrinkwrap Licenses*, 68 S.Cal.L.Rev. 1239, 1241 (1995)). Shrinkwrap licenses are in-

tended to take the place of any bargains or agreements between mass market software producers and users, because the typical software transaction does not involve bargained agreements concerning use limitations, but a purchase made by a computer user at a retail store or through the mail, with little discussion or bargaining between the producer and the user. In placing a shrinkwrap license provision on its software product, the producer seeks to 1) prohibit unauthorized copies; 2) prohibit software rental; 3) prohibit reverse engineering and modifications to the software; 4) limit the use of software to one central processing unit; 5) disclaim warranties; and 6) limit liability. Lloyd L. Rich, *Mass Market Software and the Shrinkwrap License*, 23 Colo. Law. 1321 (1994).

The widespread use of shrinkwrap licenses has generated intense interest in academic and intellectual property fields, but surprisingly little litigation. *See Step–Saver Data Sys., Inc. v. Wyse Technology*, 939 F.2d 91 (3d Cir.1991); *Vault Corp. v. Quaid Software Ltd.*, 847 F.2d 255; *Arizona Retail Sys., Inc. v. Software Link, Inc.*, 831 F.Supp. 759 (D.Ariz.1993). Most commentators view shrinkwrap licenses as being of questionable validity, primarily because software users do not have an opportunity to bargain over their terms. *See* Lemley, *supra*, 68 S.Cal.L.Rev. at 1263 n. 107 (citing articles). In addition to raising issues of enforceability, shrinkwrap licenses also pose important questions about the extent to which individual contract provisions can supplement or expand federal copyright protection. It is important to analyze these licenses carefully, not only to determine their validity but also to ascertain whether they are preempted by the Copyright Act.

#### 1. *The user agreement*

▬ In addressing shrinkwrap licenses, the starting point is how to treat a sale of software: as a sale of goods under Article II of the Uniform Commercial Code or as a "license" to the user. Most courts have chosen the first route and have applied the U.C.C. to mass market software transactions. Lemley, *supra*, 68 S.Cal.L.Rev. at 1244 n. 23

(citing numerous federal and state law cases); *but see Microsoft Corp. v. Harmony Computers & Electronics, Inc.*, 846 F.Supp. 208 (E.D.N.Y.1994). Commentators agree that the U.C.C. should apply to computer software transactions. *See* Bonna Lynn Horovitz, Note, *Computer Software as a Good Under the Uniform Commercial Code: Taking a Byte out of the Intangibility Myth*, 65 B.U.L.Rev. 129 (1985); Lemley, *supra*, 68 S.Cal.L.Rev. at 1244 n. 23. I will not address this issue in detail but note only that there are sound reasons for treating a software transaction as a sale of goods under the U.C.C. rather than as a license: purchasers of mass market software do not make periodic payments but instead pay a single purchase price, the software company does not retain title for the purpose of a security interest and no set expiration date exists for the "licensed" right. *See* Gary W. Hamilton & Jeffrey C. Hood, *The Shrink–Wrap License—Is It Really Necessary?*, 10 Computer Law 16 (1993). Plaintiff cites only *Microsoft Corp.*, 846 F.Supp. 208, in support of its characterization of the transaction as a license. The opinion is not persuasive. The court did not address the applicability of the U.C.C. in holding that Microsoft licenses rather than sells its products. *Id.* at 213. Plaintiff is no more convincing when it argues that the courts have applied the U.C.C. to software transactions only when a sale of hardware is involved. *See, e.g., Advent Sys. Ltd. v. Unisys Corp.*, 925 F.2d 670, 676 (3d Cir.1991) ("... we hold that software is a "good" within the definition in the Code). In analyzing the parties' transaction, I will apply the U.C.C., as adopted by Wisconsin. (For ease of uniform reference, I will cite the relevant U.C.C. provisions, pointing out the specific Wisconsin statutory provisions where necessary.)

Before examining the application of the U.C.C. to plaintiff's user agreement, I note two cases that plaintiff cites in support of its argument that its user agreement is binding on defendants. *Barazzotto v. Intelligent Sys., Inc.*, 40 Ohio App.3d 117, 532 N.E.2d 148 (1987); *McCrimmon v. Tandy Corp.*, 202 Ga.App. 233, 414 S.E.2d 15 (1991), *cert. denied*, (Feb. 4, 1992). *Barazzotto* and *McCrimmon* deserve only passing mention because neither addresses the issues of this case directly. In *Barazzotto*, the court held that a manufacturer's disclaimer of liability appearing on software packaging was not binding as to the retail seller. *Id.* at 120, 532 N.E.2d at 151. The court did not address whether that disclaimer was valid as to the software manufacturer. In *McCrimmon*, the court enforced a limited warranty included by a retail seller on the back of a sales receipt when the warranty was available for customer inspection prior to purchase, noting that it was the customer's responsibility to read the receipt when it was tendered to him at the time of purchase. *Id.* at 236, 414 S.E.2d at 18.

Defendants did not have the opportunity to inspect the user agreement before purchasing Select Phone™ because it was inside the packaging box and accordingly, they cannot be held to the same standards as those applied in *McCrimmon*. Plaintiff's argument that defendants had the opportunity to inspect the Select Phone™ user agreement after their first purchase and thus should be held to their knowledge of the agreement on their second and third purchases will be addressed later.

The parties dispute how their transaction should be analyzed under Article II of the U.C.C. and suggest three possibilities. The agreement could be considered an offer subject to the right of inspection under § 2–206, a written confirmation of a previously established contract under § 2–207, or a proposed modification of a contract under § 2–209. Plaintiff argues that § 2–206 should apply, contending that acceptance did not occur at the moment of payment but was subject to defendants' right of inspection and revocation that they did not exercise. In defendants' view, the contract for the sale of Select Phone™ was completed at the time of sale and the license represents additional terms to which they cannot be bound under either § 2–207 or § 2–209.

### a. Section 2–206

Section 2–206, Wis.Stat. § 402.206, sets forth basic notions of offer and acceptance. Under § 2–206, the placement of a

product such as Select Phone™ on a store shelf constitutes an offer. *See, e.g., Barker v. Allied Supermarket,* 596 P.2d 870 (Okla. 1979). Acceptance occurs in any manner reasonable under the circumstances. § 2–206(1)(a). Defendants accepted plaintiff's offer to sell Select Phone™ in a reasonable manner at the moment they purchased the product by exchanging money for the program. *Peeters v. State,* 154 Wis. 111, 142 N.W. 181 (1913) (sales contract results when customer pays purchase price and departs with item). Paying for a software program is a reasonable manner of accepting the offer implicit in the program's display on a store shelf. Defendants' payment for the program constitutes conduct sufficient to create a contract under § 2–204, Wis.Stat. § 402.204, the U.C.C. provision governing initial contract formation, which states that:

> A contract for the sale of goods may be made in any manner sufficient to show agreement, including conduct by both parties which recognizes the existence of such a contract.

Plaintiff cannot reasonably expect that further action from defendants would be required to make that sales contract binding. The purchase of the product was sufficient to show agreement between the parties.

Plaintiff argues that defendants' acceptance of the software was contingent upon their rights of inspection, rejection or revocation, but §§ 2–204 and 2–206 do not mention any such rights. Sections 2–602 and 2–608, Wis.Stat. §§ 402.602 and 402.608, offer such rights, yet these sections do not apply in this context. Section 2–602 grants buyers receiving a tender or delivery of goods an opportunity to inspect the goods before accepting. It guarantees that buyers will not be saddled with goods that have been damaged or are otherwise unsatisfactory upon arrival, but it does not create a right to inspect additional written contractual terms. Inspection of new contractual terms is covered under other sections of the U.C.C. *See* U.C.C. §§ 2–207 and 2–209. Section 2–608 allows a purchaser to revoke his acceptance when the goods' nonconformity with the contract substantially impairs their value. *H.B. Fuller Co. v. Kinetic Sys., Inc.,* 932 F.2d 681 (7th Cir.1991).

Again, the provision exists to offer buyers some form of protection when purchased items do not serve their intended purpose.

Defendants do not contend that the Select Phone™ product failed to work as they thought it would. Rather, their dispute concerns the manner in which the contract limits their use of the product and, as such, is more appropriately viewed under § 2–207 or § 2–209. Plaintiff cites one case in support of its argument that § 2–206 should apply, *Sherkate Sahami Khass Rapol v. Henry R. Jahn & Son, Inc.,* 531 F.Supp. 1048, 1054–1055 (S.D.N.Y.1982), *rev'd on other grounds,* 701 F.2d 1049 (2d Cir.1983), but the case does not bolster its argument. *Sherkate* only reiterates the language of the U.C.C. as it applies to shipments of goods and does not suggest that these provisions should apply to the inspection of contractual terms.

**b. Sections 2–207 and 2–209**

 The application of sections 2–207 and 2–209, Wis.Stat. §§ 402.207 and 402.209, is best analyzed by examining *Step–Saver Data Sys., Inc.,* 939 F.2d 91, and *Arizona Retail Sys., Inc.,* 831 F.Supp. 759, the two leading cases on the enforceability of shrinkwrap licenses. Neither case involved the type of transaction between a computer user and a software producer that took place in this case when defendants purchased mass market software at a retail outlet. Nonetheless, in both cases, the courts reached the conclusion that the shrinkwrap licenses at issue should be invalidated. The cases provide insight into the application of the U.C.C. to the Select Phone™ user agreement.

The facts of *Step–Saver* and *Arizona Retail* are quite similar. Each case involved a series of transactions between retail computer stores and a software company named The Software Link, Inc. In *Step–Saver,* 939 F.2d 91, the retail store telephoned The Software Link and offered to purchase a specific software program. The Software Link accepted the offers over the telephone and agreed to ship copies of the program. During these discussions, The Software Link never mentioned any additional terms of the sales contract beyond the agreement to ship the software in exchange for monetary consideration.

*Id.* at 96. However, when the software packages arrived they were wrapped in shrinkwrap plastic upon which was affixed a box-top license setting out a number of terms purporting to disclaim warranties and limit remedies. Problems arose with the program and Step–Saver sued to recover damages.

The factual background of *Arizona Retail,* 831 F.Supp. 759, differs only in the initial transaction between the retail store, Arizona Retail, and The Software Link. After Arizona Retail first telephoned to inquire about a specific software program, The Software Link sent two copies of the software, an evaluative copy and a "live" copy. Arizona Retail spent two hours using the evaluative copy, determined it wanted to purchase the program, and then opened the live copy upon which was attached the box-top license. *Id.* at 761. Subsequently, Arizona Retail purchased additional copies of the software through telephone transactions virtually identical to those in *Step Saver.* The court considered the initial transaction separately from the subsequent transactions, explaining that the initial offer took place when The Software Link sent a live copy of the software with the evaluation diskette. *Id.* at 764. The live copy was sealed in an envelope upon which was added the statement that a user acknowledges "acceptance of this product, and [consents] to all the provisions [of] the Limited Use License Agreement" by opening the envelope. The court held that Arizona Retail had accepted The Software Link's offer and a contract was formed when it opened the envelope. *Id.* The terms of the box-top license were incorporated into that contract because they were visible on the outside of the envelope and Arizona Retail had been exposed to them before the contract was formed. *Id.* at 763.

The court distinguished this situation from the subsequent transactions in that case and from the transactions in *Step–Saver,* 939 F.2d 91, in all of which a contract was formed and complete at the moment the parties agreed to order and ship goods. In the subsequent transactions, the agreement was formed before Arizona Retail became aware of The Software Link's insistence on the terms of the box-top license and thus those terms could not be considered part of the initial offer. *Id.* at 763–66. Even though Arizona Retail knew that The Software Link had imposed box-top license provisions in the first sale, the court held that the store did not know that The Software Link would impose box-top license provisions when it placed subsequent orders because The Software Link did not mention any such terms in the parties' telephone conversations. *Id.* at 764. The court's holding accorded with the holding of the Court of Appeals for the Third Circuit in *Step–Saver,* 939 F.2d at 105–06, that the box-top license terms could not be considered part of The Software Link's initial offer because Step–Saver was not apprised of those terms before the agreement to order and ship software.

Because the box-top licenses were not part of the agreements to order and ship software, both the *Arizona Retail* and *Step–Saver* courts considered other methods of analyzing the application of the licenses' terms to the parties' contracts. In *Step–Saver,* the court analyzed the terms under § 2–207, *id.* at 98; in *Arizona Retail,* 831 F.Supp. 759, the court determined that § 2–209 was a better fit. *Id.* at 765.

*Step–Saver* and *Arizona Retail* suggest two possibilities for analyzing the alleged contract between plaintiff and defendants. One view is that the terms of the user agreement were incorporated into plaintiff's sales offer by the reference on the outside of the Select Phone™ package. If this is the case, then defendants are bound to the terms of the agreement because they opened and used the product, just as Arizona Retail was bound initially to the terms of The Software Link's box-top license. The other view is that the user agreement was not included in plaintiff's sales offer and represents either a proposed modification to the sales agreement under § 2–209 or a written confirmation of a previously established contract under § 2–207. Section 2–207 governs situations in which parties have reached a general agreement but have yet to agree on specific terms desired by one of the parties. *Arizona Retail,* 831 F.Supp. at 763. Section 2–209 controls the modification of contracts after their formation. *Id.*

In *Arizona Retail*, 831 F.Supp. 759, the court considered the terms of the box-top license binding on Arizona Retail in the initial transaction because those terms were visible to Arizona Retail before it opened the software envelope. It is evident from the court's citation to *McCrimmon v. Tandy Corporation*, 202 Ga.App. 233, 414 S.E.2d 15, in which a purchaser was held to a warranty disclaimer he had the opportunity to read before making his purchase, that the court believed that the terms must be made apparent before contract formation. *Id.* at 764, 765 n. 3 (warranty disclaimers in *McCrimmon* made apparent to buyer at time of acceptance rather than afterwards). In *Step–Saver*, 939 F.2d 91, the court acknowledged the importance of exposure to specific terms when it noted the "well-established distinction between conspicuous disclaimers made available before the contract is formed and disclaimers made available only after the contract is formed." *Id.* at 104–105, n. 45.

The terms of the Select Phone™ user agreement were not presented to defendants at the time of sale. The sole reference to the user agreement was a disclosure in small print at the bottom of the package, stating that defendants were subject to the terms and conditions of the enclosed license agreement. Defendants did not receive the opportunity to inspect or consider those terms. Mere reference to the terms at the time of initial contract formation does not present buyers an adequate opportunity to decide whether they are acceptable. They must be able to read and consider the terms in their entirety. The potential incorporation of the terms can occur only after the purchaser opens the package and has a reasonable opportunity to inspect the user agreement. Sections 2–207 or 2–209 control that incorporation.

Plaintiff argues that even if the user agreement was not incorporated into its initial sales offer, defendants should have known about the user agreement after the initial purchase and should be subject to its terms in subsequent purchases. In *Step–Saver*, 939 F.2d at 104, the court rejected this argument, recognizing that exposure to proposed terms in previous transactions did not change the fact that these terms were not agreed to at the time of subsequent contract formations. The court explained that it would be unjust to allow a seller that failed in its attempt to incorporate certain terms into an initial contract to hold the buyer to the same terms in subsequent transactions without first receiving the buyer's express assent. The court held that it was reasonable for Step–Saver to believe from The Software Link's shipment of the software without any mention of terms that the manufacturer had agreed to do business without the box-top license terms. *Id.* Surprisingly, in *Arizona Retail*, 831 F.Supp. 759, the court did not confront the significance of Arizona Retail's knowledge of the box-top license terms as applied to the subsequent software transactions although it had drawn a distinction between the initial and subsequent transactions. Nonetheless, the court's opinion makes apparent its belief that express assent is required to terms that are not specifically made part of an agreement. *Id.* at 766.

The decision on this issue is a close call. Defendants may have known the exact terms of the user agreement at the time of their second and third purchases of Select Phone™. In that case, I would not find it inherently "unjust," as did the court in *Step–Saver*, to hold a party to the terms a seller incorporates into a standard form contract. However, I would agree with that court that it is unwise to hold a buyer to those terms when software companies are free to change the terms of their shrinkwrap licenses between initial and later versions of their products. Like any other parties to a contract, computer users should be given the opportunity to review the terms to which they will be bound each and every time they contract. Although not all users will read the terms anew each time under such circumstances, it does not follow that they should not be given this opportunity. Defendants cannot be held to the user agreement included with the second and third copies of Select Phone™ they purchased merely because they were aware of the terms included with the initial version. Each software purchase creates a new contract. Computer users should be given a

fresh opportunity to review any terms to which those contracts will bind them.

■ It is unnecessary to consider in detail the distinctions between §§ 2–207 and 2–209 because the terms of the user agreement are not binding on defendants regardless which section is applied. *See Arizona Retail*, 831 F.Supp. at 766 (Arizona Retail not bound by license agreement under either § 2–207 or § 2–209). The court determined that the license agreement was best seen as a proposed modification of the parties' sales contract under § 2–209 and ruled that the terms of that agreement were not effective because Arizona Retail had never assented to them. *Id.* at 765. Section 2–209 requires the express assent of a party to any proposed contractual modifications. Assent cannot be inferred from a party's conduct in continuing with an agreement. *Id.* at 759; *Step–Saver*, 939 F.2d at 98–99. In this case, defendants did not assent expressly to the terms of the user agreement. Their continued use of the Select Phone™ product has no bearing on whether they accepted the user agreement. Under these circumstances, § 2–209 does not warrant the incorporation of the user agreement into the parties' initial sales agreement.

■ In *Step–Saver*, 939 F.2d 91, the court discussed at length the application of § 2–207 to the software transactions between Step–Saver and The Software Link, noting that § 2–207 was intended to end a "battle of forms" between merchants that took place under common law because a party was bound to the terms of the last sent form if it proceeded to perform the contract after receiving that form. *Id.* at 99. Under § 2–207(2), the terms proposed in such forms are to be considered proposals for addition to the contract. These terms become binding on merchants unless certain important conditions are met. Section 2–207 is silent on how additional terms should be construed in a transaction between a merchant and a consumer. Keeping in mind the legislative goal behind § 2–207, it is improbable to think that the drafters wanted consumers to be held to additional proposed terms in situations in which merchants were given protection. Because § 2–207 is concerned primarily with contract wars between merchants, it is pref-

erable to analyze the Select Phone™ user agreement under § 2–209. Nonetheless, applying § 2–207 to the consumer transaction in this case still leads to the conclusion that the user agreement was not binding on defendants because they never agreed to it expressly and it never became part of the agreement between the parties.

I conclude that because defendants did not have the opportunity to bargain or object to the proposed user agreement or even review it before purchase and they did not assent to the terms explicitly after they learned of them, they are not bound by the user agreement.

### c. Draft section 2–2203

The American Law Institute, drafters of proposed new U.C.C. provisions, has suggested a provision, § 2–2203, that would make standard form licenses enforceable if:

(a) ... prior to or within a reasonable time after beginning to use the intangible pursuant to an agreement, the party

(1) signs or otherwise by its behavior manifests assent to a standard form license; and

(2) had an opportunity to review the terms of the license before manifesting assent, whether or not it actually reviewed the terms.

*Lemley, supra,* 68 S.Cal.L.Rev. at 1293. This proposal is evidence that the American Law Institute views current law as insufficient to guarantee the enforcement of standard form contracts such as shrinkwrap licenses. The draft provision appears to introduce a § 2–206 type of inspection, rejection and revocation element into shrinkwrap contracts and thereby place significant responsibility on buyers to actively reject those terms by returning the goods if they find the terms unacceptable. Louisiana and Illinois enacted similar legislative schemes in the 1980s but they are no longer in effect. David A. Rice, *Public Goods, Private Contract and Public Policy: Federal Preemption of Software License Prohibitions Against Reverse Engineering,* 53 U.Pitt.L.Rev. 543, 565 (1992). The Louisiana statute was partially invalidated by the Court of Appeals for the Fifth

Circuit on federal preemption grounds, *Vault Corp.*, 847 F.2d at 270, and Illinois repealed its law. *Id.* If the draft provision gains substantial acceptance among the states, the application of the U.C.C. to shrinkwrap licenses may no longer require detailed consideration. In that event, federal preemption concerns will become even more prominent. I turn next to that issue.

## C. *Preemption of State Law Claims*

■ Section 301 governs preemption of state law claims that conflict with the federal copyright policies embedded in the federal Copyright Act. 17 U.S.C. § 301. It comes into play only if both of two conditions are satisfied: 1) the work in which the state law right is asserted comes within the "subject matter" of copyright, as specified in 17 U.S.C. §§ 102 or 103; and 2) the state law right asserted is equivalent to any of the rights specified in 17 U.S.C. § 106. *Baltimore Orioles v. Major League Baseball Players*, 805 F.2d 663, 674 (7th Cir.1986).

### 1. *Subject matter of copyright*

Plaintiff begins with the proposition that if defendants are correct in arguing that the Select Phone™ data compilation cannot be copyrighted, it follows as a matter of course that the data are outside the subject matter of the federal copyright law. The line is not so clear as plaintiff would draw it. Section 102 of the Copyright Act, 17 U.S.C. § 102, extends copyright protection to original works of authorship including literary, musical, dramatic and a number of other types of works. Factual compilations are included within the subject matter of copyright by 17 U.S.C. § 103 and are defined elsewhere in the act as a collection of data or materials arranged in such a way as to constitute an original work of authorship. 17 U.S.C. § 101.

■ The law in this circuit is that the "subject matter of copyright" includes works that fit within the general subject matter of §§ 102 and 103, whether or not the works qualify for actual protection. *See Baltimore Orioles v. Major League Baseball Players*, 805 F.2d 663. The question in the *Baltimore Orioles* case was whether major league base-ball clubs owned exclusive rights to the televised performances of the players during major league baseball games. *Id.* at 665. The players argued that they had a state law right of publicity in their performances; the clubs contended that federal copyright law preempted this state law right. The court rejected the players' argument that because their performances lacked sufficient creativity and were not copyrightable, they fell outside the subject matter of copyright. In concluding that a work can fall within the subject matter of copyright even if it lacks any creativity or originality, the court relied on a House of Representatives report: "As long as a work fits within one of the general subject matter categories of section 102 and 103, ... [section 301(a) ] prevents the States from protecting it even if it fails to achieve Federal copyright because it is too minimal or lacking in originality to qualify." *Id.* at 676 (citing H.R.Rep. No. 1476, 94th Cong., 2d Sess. 51 (1976), *reprinted in* 1976 U.S.C.C.A.N. 5659, 5747).

Other courts have ruled similarly. *See Harper & Row Publishers, Inc. v. Nation Enterprises*, 723 F.2d 195, 201 (2d Cir.1983), *rev'd on other grounds*, 471 U.S. 539, 105 S.Ct. 2218, 85 L.Ed.2d 588 (1985) (accepting opposite position would allow states to "expand the perimeters of copyright protection to their own liking" and would "run directly afoul of one of the Copyright Act's central purposes, to 'avoid the development of any vague borderline areas between State and Federal protection.' " (citing H.R.Rep. No. 1476, 1976 U.S.C.C.A.N. at 5746)); *Ehat v. Tanner*, 780 F.2d 876, 877 (10th Cir.1985), *cert. denied* 479 U.S. 820, 107 S.Ct. 86, 93 L.Ed.2d 39 (1986) (Congress stated expressly that § 301 is intended to prevent "the States from protecting ... [a work] even if it fails to achieve Federal statutory copyright because it is too minimal or lacking in originality to qualify") (citing H.R.Rep. No. 1476, 1976 U.S.C.C.A.N. at 5747). *See also Nash v. CBS, Inc.*, 704 F.Supp. 823, 832 (N.D.Ill. 1989) (state law claims do not avoid preemption simply because they are based upon improper use of uncopyrightable material contained in works properly subject to copyright).

The Court of Appeals for the Seventh Circuit touched on this issue in *United States Trotting Ass'n v. Chicago Downs Ass'n, Inc.*, 665 F.2d 781 (7th Cir.1981). The court held that a misappropriation claim was not preempted because it did not fall within the realm of federal copyright law. *Id.* at 786 n. 6. Although the Court of Appeals for the Seventh Circuit did not mention *United States Trotting Ass'n* in *Baltimore Orioles*, its decision in the latter case seems to over-rule any suggestion in *United States Trotting Ass'n* that uncopyrightable material cannot fall within the subject matter of copyright law.

In *Baltimore Orioles*, 805 F.2d 663, the court muted the full impact of its holding by noting that regardless of the originality of the players' performances, the recordings of the games were original enough to come within the scope of copyright law because of the creative contributions of the announcers. *Id.* at 676. Plaintiff would like this court to believe that by hedging its decision in this manner, the court left open the question whether uncopyrightable material can fall within the subject matter of copyright. Its argument is unpersuasive in light of the court's reliance on explicit congressional intent and the holdings of the other circuits.

Plaintiff notes that the Nimmer treatise criticizes the court's holding in *Baltimore Orioles* on this issue, proposing that it was confused over which works fall within the subject matter of copyright. David Nimmer & Melville B. Nimmer, *Nimmer on Copyright*, § 1.01[B] at 1–24, n. 101 (1995). The Nimmers' views notwithstanding, *Baltimore Orioles* is still good case law in this circuit and I am bound to apply it.

■ The telephone listings on the Select Phone™ CD–ROM discs are a compilation of facts that would qualify for copyright protection under § 103 if they were sufficiently original; that they lack the necessary originality does not affect their status as coming within the subject matter of copyright. *Baltimore Orioles* compels the conclusion that plaintiff's uncopyrightable compilation of telephone data satisfies the first prong of the preemption test.

**2. *Equivalency of asserted rights to rights specified in § 106***

■ A right is equivalent to one of the rights set forth in § 106 if it "is infringed by the mere act of reproduction, performance, distribution or display." *Baltimore Orioles*, 805 F.2d at 677 (citing Nimmer, *supra*, § 1.01[B][1] ). To avoid preemption, a cause of action defined by state law must incorporate an "extra element" beyond those necessary to prove copyright infringement. *Trandes Corp. v. Guy F. Atkinson Co.*, 996 F.2d 655, 659 (4th Cir.), *cert. denied*, —— U.S. ——, 114 S.Ct. 443, 126 L.Ed.2d 377 (1993). Section 106 of the Copyright Act, 17 U.S.C. § 106, grants the owner of a copyright exclusive rights of reproduction and distribution. The causes of action on which plaintiff's state law claims are based are designed to protect these same reproduction and distribution rights. As such, plaintiff's asserted state law rights are equivalent to rights provided by § 106 and its state law claims are preempted under § 301.

**a. Contract claim**

■ Several federal courts have held that breach of contract claims are not preempted by § 301 of the Copyright Act because breach of contract is not a cause of action "equivalent" to a copyright infringement claim. *National Car Rental Sys., Inc. v. Computer Associates Int'l Inc.*, 991 F.2d 426, 433 (8th Cir.), *cert. denied*, —— U.S. ——, 114 S.Ct. 176, 126 L.Ed.2d 136 (1993); *Taquino v. Teledyne Monarch Rubber*, 893 F.2d 1488, 1501 (5th Cir.1990); *Acorn Structures, Inc. v. Swantz*, 846 F.2d 923, 926 (4th Cir.1988); *Trenton v. Infinity Broadcasting Corp.*, 865 F.Supp. 1416, 1429 (C.D.Cal.1994). Plaintiff argues that the contractual restriction imposed in its user agreement established an "extra element" that makes its breach of contract claim different from its copyright infringement claim but, in reality, its breach of contract claim is nothing more than an effort to prevent defendants from copying and distributing its data, exactly what it sought to bar defendants from doing under copyright law. *See Ehat*, 780 F.2d at 878. The "extra element" test used to determine whether a state law right is equivalent

to a right protected by copyright law requires more than the mere existence of an extra element in the state law claim. It requires an extra element that makes the state law claim qualitatively different from the underlying copyright claim. *See Data General Corp. v. Grumman Sys. Support Corp.*, 36 F.3d 1147, 1164 (1st Cir.1994) ("Not every 'extra element' of a state claim will establish a qualitative variance between the rights protected by federal copyright law and those protected by state law"); *Harper & Row Publishers*, 723 F.2d at 201 (additional elements did not establish a fundamental nonequivalence between state and federal rights implicated); Rice, *supra*, 53 U.Pitt. L.Rev. at 616 (Section 301 concerned with effects, not form).

Each of the breach of contract cases plaintiff cites involved the assertion of rights significantly different from the reproduction and distribution rights protected under copyright law. In *National Car Rental*, 991 F.2d 426, the plaintiff licensed the defendant to use its software for internal operations and for the processing of the defendant's data. When the defendant used the software to process the data of a third party, the plaintiff sued, contending that the defendant used the software in a manner outside the bounds of the contract. *Id.* at 428. The court found that the agreement created a right that did not exist under copyright law, an "extra element" that made the breach of contract claim qualitatively different from a copyright infringement claim. *Id.* at 433. The plaintiff did not claim that the defendant had improperly reproduced, distributed or displayed the software, all of which would be claims that would have to brought under federal copyright law. *Taquino*, 893 F.2d 1488, and *Trenton*, 865 F.Supp. 1416, contain reasoning similar to that in *National Car Rental*. In *Taquino*, the court held that the provisions in a covenant not to compete were valid and that the rights the plaintiff sought to protect by enforcing the contract were sufficiently distinct from reproduction and distribution rights as not to be preempted by the federal Copyright Act. 893 F.2d at 1501. In *Trenton*, the court found a breach of contract claim not preempted by federal copyright law because "the contract-based causes of action

do allege more than the unauthorized use of a copyrighted work. They also claim that there has been a breach of an underlying contract . . ." *Trenton*, 865 F.Supp. at 1429. The court did not elaborate further on its reasoning. In *Acorn*, 846 F.2d 923, a suit brought by an architect against a prospective customer who used the architect's plans to build his house without fulfilling his obligation to pay for them, the court viewed the architect's contract claim as a separate and distinct cause of action that did not arise out of the subject matter of copyright. *Id.* at 926.

To the extent that *National Car Rental, Taquino, Trenton* and *Acorn* support the proposition that a copyright infringement claim is not equivalent to a contract claim merely because the contract claim requires a plaintiff to show the additional element of breach, I disagree respectfully with their conclusions. Contracts that seek to protect reproduction and distribution rights step into territory already covered by copyright law. It would alter the "delicate balance" of copyright law to allow parties to avoid copyright law by contracting around it.

██ *National Car Rental, Taquino, Trenton,* and *Acorn* do show that contract claims are not preempted automatically by federal copyright law. Contracts that are consistent with the copyright law's goals of self-protection should be upheld. Rightful owners should be able to define the limits of permissible copying or modification of their works. Thomas Lee Hazen, *Contract Principles as a Guide for Protecting Intellectual Property Rights in Computer Software: The Limits of Copyright Protection, the Evolving Concept of Derivative Works, and the Proper Limits of Licensing Arrangements*, 20 U.C.Davis.L.Rev. 105, 142 (1986). It is only when a contract erects a barrier on access to information that under copyright law should be accessible that § 301 operates to protect copyright law from individually crafted evasions of that law. *See* Rice, *supra*, 53 U.Pitt.L.Rev. at 614 ("The far-reaching public policy Section 301 implements clearly requires preemption of contract-based protection of expression as expression where the effect is to secure rights in that expression

which are greater than, equal to, or supplemental of those which Section 106 secures); Hazen, *supra,* 20 U.C.Davis L.Rev. at 129 ("[C]ourts should invalidate contracts attempting to expand the intellectual property's protection too far beyond the parameters of copyright law on the grounds of statutory preemption, or as against public policy"); Christopher Celentino et al., *Vault Corp. v. Quaid Software Ltd.: Invalidating Shrink–Wrap Licenses?,* 2 J.L. & Tech. 151, 162 (1987) (*Vault* opinion has merit if it means that contracts providing rights greater than or equivalent to those under copyright law are preempted).

Plaintiff's license agreement is an attempt to avoid the confines of copyright law and of *Feist,* 499 U.S. 340, 111 S.Ct. 1282, 113 L.Ed.2d 358. Its prohibition on the distribution of public information cannot be squared with the purposes of copyright law or with plaintiff's own compilation of data. Had each of the compilers of the 3,000 directories that plaintiff used to put together its database attached a set of terms prohibiting further distribution of the information included in its directories, plaintiff would not have been able to create Select Phone™ without negotiating with and compensating each compiler for use of its data. The Supreme Court's decision in *Feist* allowed plaintiff to avoid these problems and create its database without any fear of copyright infringement. It is ironic that after plaintiff has attained the benefits of copyright law, it wants to prevent others from receiving that same protection. Unfortunately for plaintiff, the rules of the game have not changed. Just as plaintiff had public access to the telephone listings, so do defendants. Plaintiff cannot use a standard form contract to make an end run around copyright law. Its contract claim is preempted by § 301.

b. Misappropriation claim

█ I note first that plaintiff set forth an unfair competition claim in its complaint but did not develop the claim in its summary judgment briefs. Because of the close relationship between the torts of unfair competition and misappropriation, I will treat plaintiff's unfair competition claim as part and parcel of its misappropriation claim.

At an early stage, the House of Representatives bill that eventually became § 301 included misappropriation in a list of torts that were considered not equivalent to copyright infringement. *Baltimore Orioles,* 805 F.2d at 676–77 n. 25. That list was deleted from the bill shortly before passage. As enacted, 301 of the Copyright Act does not provide any explicit guidance on the preemption of misappropriation claims by copyright law. Plaintiff cites extensive language from the House Report detailing why misappropriation is not necessarily synonymous with copyright infringement:

> "... [A] cause of action labeled as 'misappropriation' is not preempted if it is in fact based neither on a right within the general scope of copyright as specified by Section 106 nor on a right equivalent thereto. For example, state law should have the flexibility to afford a remedy (under traditional principles of equity) against a consistent pattern of unauthorized appropriation by a competitor of the facts (i.e., not the literary expression) constituting 'hot' news, whether in the traditional mold of *International News Serv. v. Associated Press,* 248 U.S. 215 [39 S.Ct. 68, 63 L.Ed. 211] (1918), or in the newer form of updates from scientific, business or other financial databases. Likewise, a person having no trust or other relationship with the proprietor of a computerized database should not be immunized from sanctions against electronically or cryptographically breaching the proprietor's security arrangements and accessing the proprietor's data ..."

H.R.Rep. No. 1476, 1976 U.S.C.C.A.N. at 5748. I hesitate to place too much weight on these statements because the Court of Appeals for the Seventh Circuit has determined that the deletion of the list from the bill should be given little weight in determining whether a particular right is equivalent to copyright, stating, "almost any interpretation of the concept of equivalent rights can be inferred from the legislative history." *Baltimore Orioles,* 805 F.2d at 676–77 n. 25; *see also* Nimmer, *supra,* § 1.01[B] at 1–30 (in view of ambiguous legislative history, it is

best to ignore the significance of the earlier explicit mention and later deletion of the word "misappropriation"). In addition, the discussion of misappropriation in the House Report seems to run counter to the discussion elsewhere in the report that "in the clearest and most unequivocal language possible ..." § 301 is intended to "avoid the development of any vague borderline areas between State and Federal Protection." H.R.Rep. No. 1476, 1976 U.S.C.C.A.N. at 5746.

The majority of federal courts addressing this issue have found misappropriation claims preempted. *See* Nimmer, *supra*, § 1.01[B] at 1–35 n. 156 ("misappropriation is but another label for reproduction and as such, is a preempted right 'within the general scope of copyright' under Section 301(a)") (collecting approximately twenty appellate and district court cases holding misappropriation claims preempted); *Universal City Studios v. T–Shirt Gallery, Ltd.*, 634 F.Supp. 1468, 1476 (S.D.N.Y.1986) (New York's misappropriation tort preempted); *Mayer v. Josiah Wedgwood & Sons, Ltd.*, 601 F.Supp. 1523, 1535 (S.D.N.Y.1985) (New York's misappropriation tort preempted); *Videotronics, Inc. v. Bend Elecs.*, 564 F.Supp. 1471 (D.Nev. 1983) (where intellectual property subject to copyright law, applying state doctrine of misappropriation to protect it would create an unacceptable conflict with federal policy).

Courts reaching the opposite conclusion have analyzed misappropriation claims different in nature from the one at hand and have looked more to the "extra element" that must be proven under the state law claims in finding that Congress did not intend to preempt the cause of action at issue. The cases plaintiff cites makes this apparent. *Data General Corp. v. Grumman Sys. Support Corp.*, 36 F.3d 1147; *Princess Fabrics, Inc. v. CHF, Inc.*, 922 F.2d 99 (2d Cir.1990); *Wilson v. Mr. Tee's*, 855 F.Supp. 679 (D.N.J. 1994); *CSM Investors Inc. v. Everest Development, Ltd.*, 840 F.Supp. 1304 (D.Minn. 1994); *Rubin v. Brooks/Cole Pub. Co.*, 836 F.Supp. 909 (D.Mass.1993). None of these cases involved a misappropriation claim based solely on improper copying and distribution. Rather, the cases involved trade secrets claims requiring plaintiff to show a breach of confidentiality, *Data General*, 36 F.3d at 1165, or "palming off" claims necessitating a showing that the public is misled about the origin of the product. *Princess Fabrics*, 922 F.2d at 104 (misappropriation claim is preempted but states may still prohibit palming off); *Wilson*, 855 F.Supp. at 684 (palming off claims not preempted); *CSM Investors*, 840 F.Supp. at 1314 (neither unfair competition involving palming off nor unjust enrichment claims involving illegal benefit from another are preempted); *Rubin*, 836 F.Supp. at 924 (extra elements of misrepresentation and deceit qualitatively different from reproduction).

The Court of Appeals for the Seventh Circuit has not addressed the preemption issue as it relates to misappropriation claims, although it affirmed a district court holding to that effect. *See Nash v. CBS, Inc.*, 899 F.2d 1537 (7th Cir.1990), *aff'g on other grounds* 704 F.Supp. 823, 835 (N.D.Ill.1989). In *Nash*, 704 F.Supp. at 834, the district court noted that, "The goal underlying copyright law is the same as that driving the tort of misappropriation: balancing the need to provide economic incentives for authorship against the preservation of the freedom to imitate." However, the district court did not go so far as to hold that § 301 always preempts the tort of misappropriation. It found that the statements in the House Judiciary Committee Report on the 1976 Amendments to the Copyright Act reflected a legislative intent to keep available certain misappropriation claims. *Id.*

The elements of the tort of misappropriation in Wisconsin are "(1) time, labor and money expended in the creation of the thing misappropriated; (2) competition; and (3) commercial damage to the plaintiff." *Mercury Record Productions, Inc., v. Economic Consultants, Inc.*, 64 Wis.2d 163, 174, 218 N.W.2d 705, 709 (1974), *cert. denied*, 420 U.S. 914, 95 S.Ct. 1107, 43 L.Ed.2d 386 (1975). At first blush, the second and third factors of the *Mercury Record* test appear to constitute extra elements that would exempt Wisconsin's misappropriation tort from preemption. However, as discussed above, the mere presence of extra elements does not indicate that the underlying right is not equivalent to

rights protected under § 106 of the Copyright Act. When the purposes of copyright and misappropriation law are compared with respect to plaintiff's claim, it is evident that misappropriation does not serve any qualitatively different purposes from copyright law. Copyright law seeks to encourage individuals to create new works by offering them the security that those works will be rewarded with a limited monopoly. *Baltimore Orioles,* 805 F.2d at 678. Thus it protects authors from those who seek to usurp the copyright owner's creative efforts by copying. The tort of misappropriation offers the same type of protection. Adding competition and commercial damage does not differentiate the underlying protected right. In fact, these elements are subsumed in a party's decision to bring a copyright infringement claim. Without some form of competition and commercial damage, a party would not have the financial incentive to sue for copyright infringement. I conclude that because plaintiff's misappropriation claim is not qualitatively different from a copyright infringement claim, the underlying rights plaintiff seeks to vindicate are equivalent to federal rights and are preempted by the Copyright Act.

c. Wisconsin Computer Crimes Act claim

■■■ The Wisconsin Computer Crimes Act makes it unlawful to modify, destroy, access, take, or copy computer data willfully, knowingly and without authorization. Wis. Stat. § 943.70(2)(a). Under the statute, "data" are property and include representations of information, knowledge or facts prepared in formalized manners and intended to be processed in a computer system. Wis. Stat. § 943.70(1)(f). Under the act, the Select Phone™ telephone listings qualify as data and defendants' distribution of that data is made unlawful.

Again, the question is whether federal copyright law preempts the statute as it applies to defendants' actions. Plaintiff points to a recent Wisconsin appellate court decision in which the court held that the law was not preempted by the Copyright Act. In *State v. Corcoran,* 186 Wis.2d 616, 522 N.W.2d 226 (Ct.App.), *review denied,* ——

Wis.2d ——, 527 N.W.2d 335 (1994), the Wisconsin Court of Appeals upheld a conviction under the Wisconsin Computer Crimes Act of a computer software programmer who destroyed data stored on the computer of his former employer by inserting "booby traps" into programs he had written for the employer. *Id.* at 620, 522 N.W.2d at 228. The court explained that it did not need to consider the defendant's argument that federal copyright law preempted the Wisconsin act because the data the defendant was accused of destroying could not be protected by copyright. *Id.* at 628, 522 N.W.2d at 231 ("Therefore, we need not decide if the federal Copyrights [sic] Act preempts the enforcement of the WCCA; Corcoran was properly convicted of destroying facts that cannot be protected by copyright."). The court said that "If [it] were to address the question of ... preempt[ion]," it would apply the "extra element" test. *Id.* at 628 n. 11, 522 N.W.2d at 231 n. 11.

Plaintiff argues that the court reached its holding in *Corcoran* because the destroyed data were not copyrightable and therefore did not meet the first requirement of the preemption test, that the material fall within the subject matter of copyright. This is a reasonable interpretation of the court's holding, but not the only one. The court of appeals did not hold explicitly that such data does not "fall within the subject matter" of copyright for purposes of preemption analysis. In fact, the court's footnote seems to indicate that the court's understanding of the preemption test focused solely on the second, or "extra element" prong of the analysis. *See* 186 Wis.2d at 628 n. 11, 522 N.W.2d at 231 n. 11 ("The analysis applied by the federal courts requires a determination if the state-created cause of action contains an 'extra element' in addition to the acts of reproduction or distribution"). The court's discussion of the issue lacks specific mention of the subject matter test. As seen in *Baltimore Orioles,* 805 F.2d 663, an inquiry into the subject matter of copyright requires more than just determining whether given material is a proper recipient of copyright protection. It is unlikely that the court's single sentence mention of subject matter in *Corcoran* was

meant to foreclose future application of a more comprehensive subject matter test.

Applying the preemption test to plaintiff's claim that defendants violated the Wisconsin Computer Crimes Act, it becomes evident that the claim should be preempted for the same reasons as plaintiff's breach of contract and misappropriation claims. The first prong is satisfied because the telephone listings fall within the subject matter of copyright and the second is met because plaintiff seeks merely to prohibit the copying and distribution that it could not prevent under federal copyright law. In reaching this conclusion that federal law preempts plaintiff's claim under the Wisconsin Computer Crimes Act, I do not hold or intend to imply that the Wisconsin Computer Crimes Act is preempted in all instances. Preemption would not occur in a *Corcoran*-like situation when an individual destroys another's data purposefully. In those situations, the right sought to be enforced differs greatly from the copying and distribution rights covered by copyright law. What this conclusion does mean is that plaintiff cannot succeed on its underlying copyright claim by dressing it in other clothing. Plaintiff's efforts to establish a right under the Wisconsin Computer Crimes Act conflicts directly with the federal copyright law's directive to keep unoriginal factual compilations in the public domain. It would undermine the public access to facts and ideas if states could block such access with their own legislation.

## ORDER

IT IS ORDERED that the motion for summary judgment of defendants Matthew Zeidenberg and Silken Mountain Web Services, Inc., is GRANTED and that the motion for summary judgment of plaintiff ProCD, Inc. is DENIED. FURTHER, IT IS ORDERED that the preliminary injunction entered herein on September 22, 1995, is DISSOLVED. This order does not affect the permanent injunction entered against Ivory Tower Information Systems, Inc., pursuant to a settlement agreement on October 19, 1995. The clerk of court is directed to enter judgment for defendants Matthew Zeidenberg and Silken Mountain Web Services, Inc., and close this case.